21 So.2d 696

## FLEETWOOD v. PACIFIC MUT. LIFE INS. CO.

### 6 Div. 236.

Supreme Court of Alabama.

March 8, 1945.

Rehearing Denied April 12, 1945.

Jackson, Rives & Pettus, of Birmingham, for appellant.

Spain, Davies, Gillon, Grooms & Young and H. H. Grooms, all of Birmingham, for appellee.

STAKELY, Justice.

This is a suit brought by Robbie Gray Fleetwood (appellant) against Pacific Mutual Life Insurance Company (appellee) on a policy of life insurance in the principal sum of Eight Thousand Dollars. The policy was issued by appellee on the 22nd day of June, 1940, on the life of Harry Hill Fleetwood and is payable to Robbie Gray Fleetwood, his wife, as beneficiary. The insured, Harry Hill Fleetwood, died on October 12, 1941. The defense in this case is death of the insured by suicide, with no liability under the policy by reason of the following clause contained in the policy:

"The suicide of the Insured, sane or insane, within two years from the date of issue of this Policy is a risk not assumed under this Policy. In such event, however, the Company will pay to the Beneficiary in one sum an amount equal to the premiums received hereon, without interest, and this Policy shall thereupon be terminated."

Trial of the case resulted in a verdict and judgment for the defendant. In its oral charge the court made no reference to the presumption that a normal, sane person will not commit suicide. This presumption is often referred to as a presumption of innocence. The court refused to give a number of written charges requested by the plaintiff upon the question of presumption against suicide. Assignments of error based on these rulings will be treated together because they all involve the same principles. There is no contention in the case that the insured was insane.

We think it clear from analysis of the Alabama decisions that there are situations when the presumption is applicable and on the contrary, there are situations when the presumption has no field of operation. If the case at bar falls within the first category, then the court was in error, but if this case comes within the second class, then there was no error. To solve the problem let us briefly review the Alabama authorities on the principles involved and then make the application from a consideration of the evidence.

In the case of Sovereign Camp, W. O. W., v. Hackworth, 200 Ala. 87, 75 So. 463, the proof was direct and positive that the insured shot himself intentionally. This court held that the defendant met the burden of proof on it and since there were no conflicting inferences, the defendant was entitled to the affirmative charge.

In the case of Mutual Life Ins. Co. of N. Y. v. Maddox, 221 Ala. 292, 128 So. 383, 384, the proof tending to show suicide was entirely circumstantial. The court charged the jury that there was a presumption against suicide. It refused a special written charge to the effect that "such presumption is not evidence and cannot be treated as evidence by the jury in reaching a verdict." In referring to the Hackworth case, supra, this court said:

"While this court is firmly committed to the doctrine as we have stated it in the opinion, its uniform application is such that apparently it has never been thought to create a conflict. Though such presumption may be in the 'nature of evidence,' it has been so regarded only when the evidence as to some question of fact was otherwise conflicting or where there were conflicting inferences from it, or when it was circumstantial in nature. In the Hackworth case, supra, the evidence was direct and undisputed, and no two inferences could be reasonably drawn if the jury believed it. Likewise in criminal cases it has never been held sufficient of itself to create a conflict, or conflicting inferences, when the evidence did not otherwise show such a conflict. It is merely a principle treated in the 'nature of evidence' which is material in aiding the jury to arrive at a correct conclusion from a state of the evidence to which we have referred." Mutual Life Ins. Co. of N. Y. v. Maddox, 221 Ala. 292, 295, 128 So. 383, 386.

In the case of New York Life Ins. Co. v. Beason, 229 Ala. 140, 155 So. 530, 532, the evidence relied upon to show self-destruction as well as that tending to disprove suicide, was wholly circumstantial and afforded conflicting inferences. This court said:

"The law presumes that a normal, sane person will not commit suicide, and this presumption, referred to in the books as a presumption of innocence, is not merely an administrative feature intended only to 'shift the burden of proceeding with the evidence' to the opposite party. It is a substantive right and not a mere 'technical incident of the trial wrought for administrative purposes.' It does not spend its force as substantive evidence until the testimony in the case is sufficient, in the judgment of the jury, to overcome it." New York Life Ins. Co. v. Beason, 229 Ala. 140, 142, 155 So. 530.

From the foregoing cases we deduce the following: If there is direct and positive evidence of suicide and there is no conflicting inference from any evidence as to suicide, then the presumption against suicide has no field of operation. On the contrary, if there is direct and positive evidence of suicide and there is a conflicting inference from any evidence as to suicide, then the presumption against suicide has a field of operation. If the evidence is all circumstantial, then the presumption against suicide has a field of operation. We may add that inference means reasonable inference and not mere speculation or conjecture. Alabama Power Co. v. Watts, 218 Ala. 78, 117 So. 425; Sovereign Camp, W. O. W., v. Hackworth, supra.

The defendant introduced testimony tending to show that for some time prior to his death, the insured had had a nervous breakdown, was despondent and feared that he would become a burden to his wife because of his mental and physical condition. The defendant also introduced evidence tending to show the events immediately relating to the shooting. This testimony will be referred to later. The defendant also introduced proofs of loss submitted respectively to the Provident Mutual Life Ins. Co. of Philadelphia and to the Prudential Insurance Company of America. They both contained an employer's statement by O. J. Henley and a statement by Dr. J. H. Shamblin. The statements of Dr. Shamblin in each case showed that death was due to suicide, gunshot wound of the head. The period allowed by these policies for defense because of suicide had expired. The proceeds of these policies were paid to Mrs. Fleetwood.

According to Mrs. Fleetwood's testimony, on October 15th or 16th, she brought the policies, including the policy sued on, to Birmingham to Mr. Garden. He was the agent for the Provident Mutual Life Ins. Co. She was accompanied by her mother and Dr. Shamblin's wife. On October 20, 1941, in company with her daughter, Mrs. Fleetwood brought the policy sued on to the office of the General Agent of the Pacific Mutual Life Ins. Co. in Tuscaloosa and was given a written receipt for the policy, which showed that it was delivered for the purpose of transmittal to the Home Office, so that she could receive a check for return of the premiums paid thereon. On October 28, 1941, she was paid the premiums. The defendant next heard from the matter on April 15, 1942, when it received a letter from her attorneys, making tender of the premiums, with interest, and stating that the agent of the company had used undue influence on Mrs. Fleetwood in procuring the policy. This case was tried on the issue of suicide and not on the theory of release or accord and satisfaction. We have carefully considered the evidence and do not think it shows undue influence.

The defendant also introduced in evidence a death certificate, certified by the

State Registrar of Vital Statistics. The certificate is in the form provided for by §§ 25, 26 and 27, Title 22, Code of 1940. The certificate shows that the informant, who investigated the death, was S. T. Hardin. He signed the certificate, "S. T. Hardin, Coroner." He is the coroner of Tuscaloosa County. It showed that death of Harry H. Fleetwood was due to suicide and that the immediate cause was "self inflicted gun shot wound (pistol) of head." At the bottom of the certificate below the signature of S. T. Hardin appears the "Certification of person in charge of body." It was signed "Jones & Speigner, W. S. Willingham." They are evidently undertakers. This part of the certificate contains the following: "I certify that I am the person who was in charge of the body of the above decedent. The information was given by Mrs. H. H. Fleetwood, said to be related to the decedent as wife * * *."

Section 26, Title 22, Code of 1940, contains, among other provisions, the following:

"The coroner, or other proper officer whose duty it is to hold an inquest on the body of the deceased person and to make the certificate of death required for a burial permit, shall state in his certificate the name of the disease causing death, or if from external causes, the means of death; whether probably accidental, suicidal or homicidal; and shall, in any case, furnish such information as may be required by the state registrar in order to properly classify the death."

Section 42, Title 22, Code of 1940, provides that, "Any such copy of the record of a birth or death, when properly certified by the state registrar, shall be prima facie evidence in all courts and places of the facts therein stated."

What, then, is the effect of the death certificate in relation to the presumption against suicide? In the case of Birmingham Trust & Savings Co. v. Acacia Mut. Life Ass'n, 221 Ala. 561, 130 So. 327, the suit was on a policy of life insurance and the defense was suicide. It resulted in verdict and judgment for the defendant. A death certificate was introduced in evidence reciting that insured's death was caused by strangulation self-inflicted. On the defendant's request the following charge was given by the court:

"Charge 4. * * * 'While it is true that in the absence of any proof to the contrary, the presumption of fact is that deceased did not die by his own hand, yet when defendant introduced in evidence the certified copy of the record of deceased's death kept in the office of the State Registrar of Vital Statistics, the effect of this certificate is to prove prima facie that deceased came to his death by strangulation, self-inflicted, and if plaintiff contends that he did not so come to his death, the burden was cast by said certificate upon the plaintiff to prove to the reasonable satisfaction of the jury that death was due to some other cause than strangulation, self-inflicted.'"

This court held that there was no error in giving the charge and, among other things, said:

"As we understand, the charge means this and nothing more, that, as the law presumes that the intestate came to his death from natural causes, it was incumbent upon the defendant to show that he took his own life, and, when the defendant introduced the certificate showing that he died from self-inflicted strangulation, said certificate was prima facie proof of said recital under section 1087 of the Code of 1923 [Code 1940, Tit. 22, § 42]. It then became incumbent upon the plaintiff to go forward and rebut or overcome the prima facie case." Birmingham Trust & Savings Co. v. Acacia Mut. Life Ass'n, 221 Ala. 561, 130 So. 327, 328.

It is sought to differentiate the foregoing case from the case at bar because the aforesaid clause in the policy in the case at bar uses the word "suicide," while in that case the clause in the policy employs the expression "die by his own hand." It is urged that one may die by his own hand without having the intention to take his own life, but where the word "suicide" is used, the defendant must not only show that insured died by his own hand, but had the felonious intent to take his own life. There is no merit in the contention. Both expressions convey the idea of voluntary, intentional self-destruction. Woodmen of the World v. Wright, 7 Ala.App. 255, 60 So. 1006; Supreme Commandery, Knights of Golden Rule, v. Ainsworth, 71 Ala. 436, 46 Am.Rep. 332; Words & Phrases, Vol. 5, Perm.Ed., p. 1083; 20 Am.Jur. p. 699.

The logic of the decision in Birmingham Trust & Savings Co. v. Acacia Mut. Life Ass'n, supra, in line with the Alabama authorities cited supra, is that the death certificate, constituted direct and

positive evidence of suicide and would prevail over the presumption against suicide, unless the plaintiff went forward with the case and introduced rebuttal evidence, admitting of reasonable conflicting inference against suicide.

But it is contended in effect that in the case at bar the certificate should yield to the facts and be disregarded. Mrs. Fleetwood testified that she gave no information as to suicide. It is insisted that the only evidence which the coroner could have before him was circumstantial and that direct and positive evidence should not be predicated on circumstantial evidence. This position overlooks important considerations. As we shall see, the certificate was not only not inconsistent with the facts shown by the evidence in this case, but strengthened by them. Furthermore, we do not construe the certificate to show that the statements of S. T. Hardin were based on information given by Mrs. Fleetwood, because the reference to her is in the certificate of "the person in charge of the body." The certificate of "the person in charge of the body" makes no reference to the cause of death. Furthermore, S. T. Hardin was not a witness in the case. There is no proof of the nature or extent of his investigation. For example, at the time of the shooting there were in the Fleetwood home, where the shooting took place, not only Mr. and Mrs. Fleetwood, but also their daughter and her husband. The daughter and her husband were not witnesses in the case. We do not know what information, if any, may have been given by the daughter or her husband. We conclude that the death certificate must be given its statutory effect and constitutes direct and positive evidence of suicide.

◼ We also consider the proofs of loss submitted to the other companies direct and positive evidence of suicide, since they are admissions against interest.

In State v. Cole, 1 W.W.Harr., Del. 279, 114 A. 201, 204, it was said:

"A conspiracy may be shown either by direct evidence, that is, by the admissions and declarations of the parties or co-conspirators, or by circumstantial evidence; that is, by facts and circumstances from which the existence of the conspiracy may be inferred."

Appellant insists that the proofs of loss were not competent evidence against her on the theory that she knew nothing of their contents and did not authorize the statements as to suicide. We have carefully considered the evidence in this regard and think they were authorized by her and were competent and admissible in evidence.

It, therefore, becomes our duty in the case at bar, to look to all the evidence to see if there is evidence from which a reasonable inference contrary to suicide can be drawn. American Life Ins. Co. v. Williams, 234 Ala. 469, 472, 175 So. 554, 112 A.L.R. 1215.

On the Wednesday preceding the death of insured, witness O. J. Henley had prevailed upon insured to go to Birmingham to visit his mother, in the hopes that the visit would cheer him up. Insured on Saturday returned to his home. After dinner on Sunday, insured went upstairs. According to the testimony of Mrs. Fleetwood, in a little while she went upstairs to get something for her daughter, which she had left there, "and he asked 'what she was doing' and she said, 'I came to get something in here. Aren't you coming downstairs?' And he said, 'I will be down in a few minutes' and I went back downstairs. His bedroom was at the top of the stairs. The hall was very small. We had three bedrooms and all three opened on the little hall. The room that he was in, after you get to the top of the stairs, was to the left of the stairs. When you get to the top of the stairs you are right at the door to his room. He kept his medicine in the chest of drawers inside that door. You could stand in the doorway and reach the chest. There was a pistol in the drawer where the medicine was kept as long as I can remember. He had the pistol in there as long as we were married. It stayed in that drawer and it had never been taken out or fired so far as I know. He kept all his medicine in that little drawer. After I went downstairs he didn't come down and the next thing I knew about it the children got up to go home and he heard them and he said, 'Bobbie, where are the children going?' And I said, 'They are going home,' and he said, 'What are they going home for?' and I said 'Bobby has to study.' That was my son-in-law. My husband said, 'What are they going home for?' and I said, 'Bobby has to study,' and he said, 'Can't he study over here?' and I said, 'No, he can't study here, his books are over there,' and he said, 'Tell them not to go home, you will be by yourself.' That was the last thing." She testified that her daughter and her hus-

band were in the house downstairs at the time of the shooting.

Previously O. J. Henley, a close personal friend of deceased and his immediate superior in Sumter Farm and Stock Company, where they were both employed, had testified as a witness for the defendant. According to his testimony, Mrs. Fleetwood related to him the events relating to the shooting almost exactly as she testified, except that according to him, Mrs. Fleetwood said, "He said, your mother will be by herself in a few minutes." Mrs. Fleetwood denied that she told him that Mr. Fleetwood said "in a few minutes." According to Mrs. Fleetwood, a shot was heard a moment after the conversation.

Insured was found lying on the floor in the hallway. His head was in a pool of blood. The pistol was on the floor 12 to 18 inches from his right hand. The insured was alone upstairs. When the police officers came to the Fleetwood home in answer to a radio call, as they entered the door, Mrs. Fleetwood said, "Did this have to be done." One of the officers was asked if after they had made their investigation the matter was then closed. The witness answered, "Yes."

We do not think that there is a reasonable, conflicting inference as to suicide in the case and, so we conclude that the court was not in error in refusing the charges on presumption against suicide.

Seventy-sixth Assignment—Refused Charge D. "It is a mistake to suppose that expressions in judicial opinions, properly there used, can be made to serve as clear, succinct statements of the law in special charges to the jury." Wear v. Wear, 200 Ala. 345, 76 So. 111, 114. Furthermore, "A charge which merely states an abstract proposition of law without instructing the jury its effect upon the issues in the case on the trial may be refused without error." Francis v. Imperial Sanitary Laundry & Dry Cleaning Co., 241 Ala. 327, 2 So.2d 388, 391. The force of the foregoing principle is peculiarly apt in this case because the charge tends to confuse in the minds of the jury trial of a criminal case and a civil case involving suicide. In a criminal case the burden of proof to establish guilt requires proof beyond a reasonable doubt, while in a civil case, where suicide is pleaded by the insurer, the burden of proof is to satisfy the jury reasonably. New York Life Ins. Co. v. Turner, 213 Ala. 286, 104 So. 643.

Seventy-ninth Assignment—Refused Charge 3. The burden of proof was upon the appellant, and was so placed by the plea of the general issue. The burden of proof of the special pleas was on the appellee, but this charge is misleading in that it appears to place the entire burden of proof from the beginning to the end of the case upon the appellee. Furthermore it employs the word "felonious" without definition. Furthermore this charge by the use of the words "preponderance of" was misleading. Kansas City, Memphis & Birmingham R. Co. v. Henson, 132 Ala. 528, 31 So. 590.

Eighty-first Assignment—Refused Charge 5. This charge was substantially covered by appellant's given Charge 2. Furthermore, it uses the word "felonious" without explanation of the meaning of that word. The charge is accordingly misleading.

Ninety-second and Ninety-third Assignments—Given Charges 11 and 13. It is argued that these charges were bad because they failed to give a definition of suicide. There was no error in giving them. Explanatory charges should have been requested, if desired. Jones v. Union Foundry Co., 171 Ala. 225, 55 So. 153; Story v. McWhorter, 216 Ala. 604, 114 So. 206. It is also contended that these charges are bad because they fail to hypothesize consideration of all the evidence. This insistence is incorrect. W. P. Brown & Sons Lumber Co. v. Rattray, 238 Ala. 406, 192 So. 851, 129 A.L.R. 526.

We have carefully considered the other assignments of error and find no error.

The judgment of the lower court is affirmed.

Affirmed.

GARDNER, C. J., and THOMAS, FOSTER, and SIMPSON, JJ., concur.