29 So.2d 218

**JEFFERSON STANDARD LIFE INS. CO. v. WIGLEY.**

**6 Div. 493.**

Supreme Court of Alabama.

Feb. 6, 1947.

Rehearing Denied March 6, 1947.

Horace C. Wilkinson, of Birmingham, and Rains & Rains, of Gadsden, for appellee.

Hugh A. Locke and Wade H. Morton, both of Birmingham, for appellant.

678

STAKELY, Justice.

This is a suit brought by Ida Leola Sterling Wigley (appellee) against Jefferson Standard Life Insurance Company (appellant) on a policy of life insurance in the principal sum of $2500. The policy was issued by appellant on September 15, 1939, on the life of Perry Braswell Wigley and is payable to Ida Leola Sterling Wigley, his wife, as beneficiary. The insured, Perry Braswell Wigley, died on August 30, 1940.

The defense in this case is death of the insured by suicide with no liability by reason of the following clause contained in the policy: "In case of self-destruction committed, whether sane or insane, within two full years from the date hereof, the extent of recovery hereunder shall be the premiums paid."

Trial of the case resulted in a verdict and judgment for the plaintiff. In its oral charge the court charged, in effect, that there is a presumption that a normal, sane person will not commit suicide. The defendant excepted to this portion of the court's oral charge and this presents the controlling question on this appeal. In the case of Fleetwood v. Pacific Mut. Life Ins. Co., 246 Ala. 571, 21 So.2d 696, 698, 159 A.L.R. 171, this court, after reviewing the Alabama authorities, said: "That there are situations when the presumption is applicable and on the contrary, there are situations when the presumption has no field of operation." From the Alabama authorities this court laid down the following rules: "If there is direct and positive evidence of suicide and there is no conflicting inference from any evidence as to suicide, then the presumption against suicide has no field of operation. On the contrary, if there is direct and positive evidence of suicide and there is a conflicting inference from any evidence as to suicide, then the presumption against suicide has a field of operation. If the evidence is all circumstantial, then the presumption against suicide has a field of operation. We may add that inference means reasonable inference and not mere speculation or conjecture. * * *"

The foregoing decision is not questioned as an authority here. The appellant insists that under the evidence in this case the presumption against suicide has no field of operation. While on the contrary the appellee insists that the presumption against suicide has a field of operation and the court was correct in charging the jury upon the presumption against suicide. To solve the problem we must go to the evidence.

Perry Braswell Wigley, the insured, died August 30, 1940, as a result of gunfire. The shooting took place in Room 215, Printup Hotel, Gadsden, Alabama. This room was occupied by the insured and one Evelyn Mattox, his paramour. She also received a gunshot wound from which she died.

The insured was at the time of his death and for sometime prior thereto engaged as a highway patrolman for the State of Alabama. About two months before his death he was transferred from Clanton, Alabama, to Gadsden, Alabama. His home was in Dawson, DeKalb County, Alabama. His wife and children continued to reside there while he was stationed elsewhere. While the insured was stationed at Clanton, Alabama, he began his affair with Evelyn Mattox. Captain Gilbert, the head of the State Highway Patrol, moved him from Clanton to Gadsden to get him away from this situation. Inspector Kelly Morgan was the insured's immediate superior officer at Gadsden. When the insured first came to Gadsden, Kelly Morgan told him "not to bring her up there, not to let her come up there," to which the insured 'said, "He wasn't going to let her come up there."

About a week before the shooting the insured and Evelyn Mattox registered at the Printup Hotel as Mr. and Mrs. Wigley. Kelly Morgan saw Wigley and Evelyn Mattox leave a picture show together on August 28, 1940. This was reported to Captain Gilbert and the insured was told that Captain Gilbert would be in Gadsden to hear a report on this matter on August 30th, which was the day following the night on which the insured was shot. Upon being advised by Kelly Morgan that Captain Gilbert would be there to hear a report on this matter, the insured said: "I told her not to come up there."

The circumstances surrounding the shooting were related by the witness Tom Powers, Manager of the Printup Hotel, as follows:

"The shooting took place between 9 and 10 o'clock on the night of August 29, 1940. I first heard about the shooting as I drove up to the side entrance of the hotel on Locust Street.

"I drove up to the side door. My negro watchman ran out. He says, 'Hurry, Mr. Powers! There's a shooting going on upstairs!' So I ran in, caught the elevator, the second floor. Just as * * * the girl opened the elevator door, a shot went off. It takes about a second or two to open the door. In the meantime, I looked out,

and this young lady, Evelyn Mattox, registered as Mrs. Wigley, was laying over on the settee, in front of the elevator, shot through the mouth. I walked around the room. Mr. Wigley was lying along side the bed. I pulled the door to, didn't go in the room, and the ambulance got the young lady away, and by that time, the police was there, and I went in the room with them. The gun was laying by the side of his hand."

Wigley was shot through the head. The sound of the shot came from the direction of the room Wigley and the woman were occupying. Powers did not go in the room at first. He testified: "I opened the door, saw him laying there. I saw the girl was out there, crying and hollering * * * The girl was on the settee in front of the elevator when the second shot was fired, a distance of 60 to 70 feet. She was shot through the mouth and died a few days later. Wigley died during the night."

According to Powers when he went to the room, Wigley was lying on his back on the floor with a pistol wound through the front of his forehead. His head was in a pool of blood. The pistol which had been issued to him by the state was lying about three inches from his right hand. No one was in the room except Wigley. There was blood on the bed, also some teeth and a bullet. Powers further testified: "I got off the elevator and went right straight to this room. I ran back down the steps and the ambulance came there, and put her in it, took her to the hospital; and they put him in another ambulance."

The defendant introduced a photograph made of the insured after his death. The photograph was made under the supervision of H. W. Nixon, State Toxicologist, who went to Gadsden to investigate the shooting. This original photograph is before the court and appears to show two wounds in the forehead of the deceased, one in the center of the forehead about halfway between the line of the eyebrows and the bottom line of the hair of the head and the other wound just below the hairline. Both wounds are in line with the nose. The witness Nixon testified that he probed both wounds, that the wound in the center of the

forehead went through the skull and entered the cranial cavity, but that the wound near the hairline did not go through the skull and did not enter the cranial cavity. He further testified that while it does not show on the photograph, by probing he found a furrow underneath the skin from the wound in the center of the forehead to the wound near the hairline. He testified that part of a lead bullet with fresh blood spattered on it was found slightly imbedded in the ceiling over the bed in the bedroom. He further testified that lead is a soft metal, that "in the boney structure of the head, the frontal part is very tough and a hot bullet fired from a gun may spatter when it hits that hard surface and I have seen it in other instances. I have seen bullets spatter on being fired." He further testified that there were no powder burns on the deceased and that ordinary washing by soap and water will not remove powder burns and that he saw the deceased after his face had been cleaned up by the undertaker. He further testified that if the pistol was held at contact with the head there would be no powder burns because the grease or stain from the bullet and from the pistol would pass inside the hole made by the bullet, but if the pistol was not held in contact with the head there would be powder burns, provided the pistol was not more than about 14 inches from the head.

The defendant introduced in evidence a copy of a death certificate certified by the Bureau of Vital Statistics, showing that the death of Perry Braswell Wigley was the result of suicide. We shall later refer to this certificate at greater length. In the case of Fleetwood v. Pacific Mutual Life Ins. Co., supra, this court held that the death certificate constitutes direct and positive evidence of suicide and will prevail over the presumption against suicide unless the plaintiff goes forward with the case and introduces rebuttal evidence admitting of reasonable conflicting inferences against suicide. The problem, accordingly, in this case is to determine whether the plaintiff successfully met this burden. It is insisted by the appellee that this burden was met by proof of two bullet holes in the forehead of the deceased. With this we agree, if both wounds penetrated the skull, because it does not appear reasonable that a man could shoot himself twice where both bullets penetrated the brain. After the first shot it does not seem that he could make the second shot. Certainly the jury would have a right so to infer. If two bullets penetrated the skull of the deceased and entered his brain, the jury would have the right to infer that there was no suicide and the deceased met his death at the hands of another.

We say this despite the difficulty which this would present in the present case. There is no proof of how many shots were fired on this occasion. There is proof that the pistol had been fired three times. Counsel suggest that the woman fired two shots into the man's head and then shot herself in the mouth. But just before the elevator door was opened, Tom Powers heard the sound of a shot coming from the direction of the room and then when the elevator door opened a second or two later, he saw the woman lying on a settee in front of the elevator, shot through the mouth, "crying and hollering." She was mortally wounded, dying four days later. She was 50 feet from the room according to the most favorable tendencies of the evidence. The room was around the hall from the settee and the elevator. But despite the contradictions in the evidence, we think there was a conflicting inference as to suicide, if there is evidence that two holes penetrated the skull. It is the business of a jury to reconcile just such conflicts in the evidence.

Accordingly, we must go to the evidence to see whether there was evidence from which the jury could infer that two bullet holes penetrated the skull of the deceased and entered his brain. To create this conflict in the evidence the appellee relies on the testimony of the witness J. L. Pierce, an experienced embalmer, licensed to practice his profession in Alabama, who examined the holes in the head of the deceased at the request of the family. We quote his testimony.

"Q. I show you a photograph that has been introduced in evidence, and which is marked 'Defendant's Exhibit No. 1.' Do you recognize that as a photograph of the dead man? A. Yes sir.

"Q. How many holes did he have in his head at the time you saw him? A. Two.

"Q. Two? How close did you get to him when you observed him, Mr. Pierce? A. I was right at him.

"Q. Right at him? A. Yes, sir.

"Q. Was there anything over those holes? A. Yes, sir.

"Q. When you first saw them? A. Yes, sir.

"Q. What? A. Wax, derma surgery wax.

"Q. Did you remove the wax? A. Yes, sir.

"Q. Was there any powder burns around those holes? A. No, sir.

\* \* \* \* \* \*

"Cross-Examination.

"Q. Did you probe to see whether both holes went in the skull? A. Yes, sir.

\* \* \* \* \* \*

"Q. You took the wax out of these scars on his head, or wounds on his head, and you say now that you probed to see whether they went through the skull? A. Yes, sir.

"Q. What did you probe with? A. With a regular probe, an embalming, what we call embalming probe for wounds.

"Q. Well, where was one of the holes? A. In the forehead.

"Q. Well, what part of it? A. Somewhere right along in here, and one right just below it.

"Q. Well, that is right about the center? A. Yes, sir.

"Q. Both of them were right near the center, weren't they? A. Well, is a little above the other one, in the center of the forehead.

\* \* \* \* \* \*

"Q. Did you say anybody was present when you did that, when you say you did that probing? A. Yes, sir.

\* \* \* \* \* \*

"Redirect Examination.

"Q. What kind of instrument, now, did you say you used to probe these wounds to see that they went in the skin? A. Reg-ular embalmers' probing instrument for bullet wounds, or anything, or any punctures.

\* \* \* \* \* \*

"Q. What kind of instrument is it? Can you describe it? A. We have two or three different sizes. We have a size about six inches long. It is very sharp, but blunt enough in it that it won't puncture in the skin and feels its way through.

"Q. By using that to feel with, you can determine the depth of the wound? A. That is right.

"Q. Whether it goes through the skull or not? A. Yes, sir.

\* \* \* \* \* \*

"Q. You say there were no powder burns on the face or in the vicinity of the wound? A. No, sir.

"Q. I will repeat again, whether anything known to the embalmers by which you can wash away powder burns?

\* \* \* \* \* \*

"A. No; there is no process whatever to remove powder burns."

██ We think it is clear that while the witness Pierce testified that he probed both wounds, he never testified that the result of the probing showed that both wounds were holes that went through the skull. There could be a hole in the head and yet of not sufficient depth to enter the cranial cavity. We conclude that there is no evidence to show that both holes penetrated to the cranial cavity.

But the appellee also seeks to justify the charge upon the presumption against suicide on the theory that the jury had the right to disregard the death certificate. This position is based on alleged defects on the face of the certificate and insufficiencies in the certificate claimed to have been developed by the evidence. To determine the questions we should first understand the nature of the certificate.

██ Under the statute the certificate is given only prima facie effect as to the facts stated in the certificate. Code of 1940, Tit. 22, § 42, See Acts 1943, p. 454, § 14. The certificate does not import absolute verity

to such stated facts, which means that the plaintiff had the right to try to contradict the facts as stated in the certificate. Woodmen of the World Life Ins. Co. v. Guyton, 239 Ala. 216, 194 So. 655; Alston v. State, Ala.Sup., 26 So.2d 877;[1] Fleetwood v. Pacific Mut. Life Ins. Co., supra; Birmingham Trust & Savings Co. v. Acacia Mut. Life Ass'n, 221 Ala. 561, 130 So. 327. This must be so because there would be no due process if the plaintiff was precluded by the certificate from a reasonable opportunity to submit to the jury all the facts bearing upon the issue of suicide. Ex parte Woodward, 181 Ala. 97, 61 So. 295.

◼ As we understand the argument, appellee does not question the foregoing statement of principle with reference to the prima facie effect of the certificate as to its recitals of fact. The appellee insists that even though it is a public record, if it was altered and is not the certificate which the coroner signed or intended to sign, then the certificate imports no verity because as a certificate it is a nullity. The record shows that the appellee objected to the introduction in evidence of the certificate on the ground that the certificate showed alterations on its face and that the duty rested on the defendant to explain the alterations before the certificate was admissible in evidence. The appellant contends that even if the foregoing be assumed to be true for the sake of argument, the certificate cannot be here collaterally assailed as a certificate and that it must be accepted here as a valid certificate.

However, in the case of Stacey et al. v. Taliaferro et al., 224 Ala. 488, 140 So. 748, 750, in dealing with the alteration of the record of a deed, this court said: "While prima facie it will be presumed that alterations of public records were made for correction by some one with authority to make them, yet this is a rebuttable presumption and may be overcome by sufficient countervailing evidence." See also Laird et al. v. Columbia Loan & Investment Co., 216 Ala. 619, 114 So. 208.

The certificate was signed by "J. Lee Headley, Coroner." He was not available as a witness because of his death. We shall first consider the defects alleged to exist on the face of the certificate. After the printed words "Immediate cause of death" the certificate contains in writing the following: "Gun shot 38 caliber pistol in center of forehead." Below that, after the printed words "Due to", appears the following in the certificate in writing: "badly powder burned. lived about 4 hours." The certificate contains also the following in printing: "and that death occurred at ——— M. on the date stated above from causes given." Inserted in the blank in handwriting is "2:30 P". Further in the certificate is the following in printing: "If death was due to external causes, fill in following: Accident, suicide or homicide (specify)". In the following blank there is written in handwriting "suicide".

◼ The certificate recites that the deceased was "badly powder burned", while the proof in the case tends to demonstrate that the deceased was not powder burned. We do not think that this statement, even though incorrect, should necessarily militate against the statement in effect that the cause of death was "suicide". At best it would only tend to show that the investigation of the coroner was not thorough. As pointed out above, the deceased could have avoided powder burns by placing the pistol in contact with his head. We make the same observation with reference to the statement that the deceased died at 2:30 "P." M., when as a matter of fact he died at 2:30 A. M. And as for the contention that the certificate is invalid because it violates the statute, Code 1940, Tit. 22, § 25, through the omission of the word "probably", we think the contention is unsound. Under the statute the certificate is only prima facie correct. "Probable has been defined to be 'having more evidence for than against'." Bain v. State, 74 Ala. 38. The effect of the certificate is the same whether it includes or omits the word "probably". We regard this as an immaterial omission.

◼ We come now to the alleged alterations in the certificate. Appellee insists that the writing in the body of the certificate is not in the handwriting of the coroner and also questions the genuineness of the

---

[1] Ante, p. 163.

signature. Some bank checks admittedly signed by the coroner were introduced in evidence. It is claimed that the handwriting on the checks and in the certificate is different. It is argued that this evidence, together with the alleged discrepancies referred to above, were sufficient to make a question for the jury as to alterations in the death certificate. However, the plaintiff introduced no expert on handwriting and in fact introduced no witness to show that the signature of the coroner on the certificate was not his signature or that the handwriting in the body of the certificate was not his handwriting. The defendant introduced testimony tending to show that the writing in the certificate was the writing of the coroner. The writings are before us. They do not within themselves furnish reasonably satisfactory proof to show alterations in the certificate.

We do not consider that the plaintiff has made sufficient proof to nullify the death certificate. Accordingly the jury had no right to disregard the death certificate and the presumption against suicide has no field of operation.

One matter remains to which we should refer. It is claimed that the assignments of error are joint and not several and therefore all assignments must be good or none will be so regarded. At the heading of the assignments of error appears the following: "Now comes the appellant, Jefferson Standard Life Insurance Company, and assigns on the record the following errors committed in the Court below on the trial of the above entitled cause:" Then follow nine assignments of error each made in a separate paragraph. We consider that the assignments of error were severally and separately made. Cairnes v. Hillman Drug Co., 214 Ala. 545, 108 So. 362.

We conclude that the court was in error in charging on the presumption against suicide and the judgment of the lower court is accordingly reversed and the cause is remanded.

Reversed and remanded.

GARDNER, C. J., and FOSTER and LAWSON, JJ., concur.