48 So.2d 176

## ELLISON v. STATE.

### 4 Div. 606.

Supreme Court of Alabama.

June 22, 1950.

Rehearing Denied Nov. 2, 1950.

E. O. Baldwin, of Andalusia, for appellant.

A. A. Carmichael, Atty. Gen., and Jas. T. Hardin, Asst. Atty. Gen., for the State.

STAKELY, Justice.

Bertha Ellison (appellant) was indicted for the murder of Chester P. Raley. Upon the trial the jury returned a verdict of murder in the second degree and fixed the punishment at 25 years in the penitentiary. The pivotal question on this appeal is whether the motion for a new trial should have been granted for insufficiency of the evidence. The evidence is circumstantial. It is the position of the state that Bertha Ellison fired the fatal shot that killed Chester P. Raley while Bertha Ellison insists that Chester Raley shot himself.

The law is ever solicitous that only the guilty shall be punished for crime. In Ex parte Acree, 63 Ala. 234, it was well said: "The humane provisions of the law are, that a prisoner, charged with a felony, should not be convicted on circumstantial evidence, unless it shows by a full measure of proof that the defendant is guilty. Such proof is always insufficient, unless it excludes, to a moral certainty, every other reasonable hypothesis, but that of the guilt of the accused. No matter how strong the circumstances, if they can be reconciled with the theory that some other person may have done the act, then the defendant is not shown to be guilty, by that full measure of proof which the law requires." See also Cooper v. State, 235 Ala. 523, 180 So. 102, and Lang v. State, 252 Ala. 640, 42 So.2d 512.

Tendencies of the evidence show that Chester Raley, the deceased, had become estranged from his wife and family. At the time of his death divorce proceedings instituted by his wife against him, were pending. Tendencies of evidence also showed that for several years before the tragedy there had been intimate relations between Bertha Ellison and the deceased.

On the night of November 6, 1948, at about ten o'clock p. m., in Andalusia, Alabama, James White, a witness for the state, started to open the door where he lived to go to work. He heard a shot. At first he could not see what had happened in the street because of an intervening apartment building. When he reached the street, he saw Bertha Ellison walking up and down in the street and crying. He said to her, "Lady can I help you?" and she said, "Yes, this man just shot himself." He told her that they would stop someone and see what could be done and in about three minutes Mr. Donald Mock came along and he asked me what had happened and I told him, "this man has shot himself." Chester

Raley was lying on the sidewalk or near the sidewalk on the east side of the street while the witness lived on the west side of the street. Donald Mock got out of his car and they went over there and found the man still living. They put him in the back seat of the car and with Bertha Ellison they carried him to the hospital.

Donald Mock, witness for the state, testified in substance as follows: "I was coming up River Fall Street in Andalusia and the defendant flagged me. I turned around and went back to see if I could help. She and White were standing on the sidewalk when I got back. They told me the man had just shot himself. We picked the man up and carried him to the hospital. At the request of Bertha Ellison, I then carried her to the home of the brother of Chester Raley. She told him that Chester had shot himself. She then got back in the car and I carried her back to the hospital."

According to C. F. Neese, witness for the state who worked in Raley's Cafe in Andalusia, he heard a conversation at about eight or eight-thirty o'clock the night Chester Raley was killed. The deceased was a carpenter by trade, there being no connection between deceased and the cafe. Neese testified: "I heard him tell her she had double crossed him and she wouldn't get a chance to do it any more." They left the cafe sometime after the conversation. He came back and got a cup of coffee and got some clothes he had in a laundry bag he had hanging up beside the wall. They left the cafe around nine o'clock. They both were served with beer.

Mrs. Viola Brogden, witness for the state, testified in substance that she saw Bertha Ellison and the deceased together on the day of the killing at about two-thirty or three o'clock in the afternoon. She heard her ask him, "Where had he been? Why was he so long?" and he replied he had "just got off from work" and she says "Work?" and he says, "Yes, I have to work for a living." She testified that they were arguing with each other but she didn't know what they were arguing about. He asked her the third time to go on and leave him alone and according to the witness she didn't appear to do it. The last time he said, "If you will only go on and leave me alone and wait until you get home," and she said "You will realize what you are saying and you will be sorry. I'll make you sorry when I get you home."

R. L. Glass, a police officer of the City of Andalusia, testified that between nine and nine-thirty he saw Bertha Ellison and the deceased standing on the sidewalk beside the Prestwood Building in Andalusia. Chester Raley was standing with his back up against the building. She was standing out in front of him and was talking to him, shaking her finger in his face. She grabbed him in the bosom and shoved him up against the wall of the building. In a few minutes they turned and started on down the sidewalk. He walked off ahead of her. She walked on and caught up with him. He didn't then pay any more attention to them.

Oscar Henley, a Police Officer of the City of Andalusia and a witness for the state, testified that he went out to the scene where Chester Raley was shot and made an examination of the ground around where he was shot. He found a hat, a pistol, a drug store package and a bullet. The shot at the time looked like it had a spot of blood or brains on it. He brought the foregoing to the station and turned them over to the state investigator. There were four bullets in the pistol which had not been fired.

C. S. Prier, witness for the state who is a criminal investigator for the state, testified that he received the .38 pistol which was fully loaded. One cartridge had been fired. He testified that one was fired and one was snapped. He sent the pistol, the empty cartridge and lead pellet to the F. B. I. Technical Laboratory at Washington and they reported that the bullet was fired from the particular pistol. Tests were made for finger prints on the pistol but the report showed no finger prints.

James A. Smith, witness for the state who is the coroner for Covington County and also in the undertaking business, testified that he examined the body of Chester Raley, deceased, that he found a hole at the bottom of the mastoid bone right behind his right ear and the bullet came out

in the "crease of his hair." He testified that there were two scratched places on the right side of the face of the deceased and the shirt front of deceased was torn in front. The effect of embalming fluid made it appear that the deceased had been hit in the eye. He testified that he made an examination for powder burns and from his experience he testified that the reaction of the embalming fluid "will show up a powder burn in about three feet" and there were no powder burns on the deceased. He did not specifically testify however as to what the effect as to powder burns would be if the pistol was fired in contact with the head.

T. L. Hattaway, witness for the defendant, on cross-examination testified that around nine o'clock on the evening of the killing he was riding Chester Raley in his taxi and when they reached a certain point on Church Street in Andalusia, Chester Raley said, "There is my woman now, I want to get off" and he let him off the cab.

Charlie Faulkenberry, witness for the defendant, testified that about two weeks before the shooting on a Sunday afternoon he met Chester Raley who asked him to take a walk with him. During the walk Chester Raley began talking about killing himself and pulled his pistol out and said, "I just damn soon kill myself right now as any other time." He said that he was in so much trouble with his family that he had just rather die than go through with it. He drew out his pistol and said, "I got it, Buddy, I got it right here. I just soon do it now as any other time." The witness testified that he had to talk him out of it. The witness testified that he talked him out of it and testified, "I would have had a murder case myself if it hadn't been for that."

Mrs. Bessie Cunningham, witness for the defendant, testified that about two months before he died, Chester Raley was at her house and he said that his family had turned against him and all of his friends and his health was bad and he didn't want to live. The witness testified in substance that there was talk of people killing themselves and he testified that she was going to hear of him doing the same thing, that he was going to kill himself. She testified that she told him that he was crazy to have those ideas in his mind and that he could live to overcome all his trouble to which he replied, "He was not crazy to kill himself that it taken a sensible person to kill themself."

Alonzo Lunsford, a witness for the defendant, testified that he was with the deceased about two months prior to the time of his death and he heard him talking and he said, "Well, I am in trouble and I am going to end it plenty soon."

Johnny Hughes, a witness for the defendant, testified that about a week or ten days prior to his death Chester Raley walked up in front of him at the court house where he worked and he asked was there any court this week and I said not any and he says, "I am in the biggest trouble I ever seen a man in in his life. I got more trouble on me than I ever seen a man in his life." He said, "I have so much trouble with my family I am going to kill myself," and I said, "Get that out of your head." At that time he ran his hand in his overalls and pulled out an old pistol. The witness was asked the following question and gave the following answers: "Q. Did he say anything about his wife making him pay alimony?" to which the witness replied, "He said he would kill himself before he did it."

Bertha Ellison, the defendant, took the stand in her own behalf and testified in substance as follows. She and Chester Raley ate supper at the cafe together. After they left the cafe when they got to the Prestwood Building he was talking about going back to Raley's Cafe to get more beer and he said, "Aren't you going too," and I said, "No, I am not going. You can go by yourself. I am going home" and she went on and he left her. "I went on towards the place where I was living. When I shoved him up against the wall of the Prestwood Building, he was trying to get me to go back to the cafe to get more beer. After I had gone some distance I saw him standing on the corner by the filling station. He overtook me. He asked me if he could walk to the house with me and I didn't answer his question, I just kept walking. Then I heard a noise but I thought it was a

fire cracker and then I heard him hit the pavement. He was about fifteen or twenty steps away from me at the time." She further testified that she had not had his gun in her hand lately, that she didn't have it on the night in question and did not shoot Chester Raley, that they took him to the hospital and then she went down to the brother of Chester Raley and told him that Chester had shot himself.

On cross-examination she denied that she had had intimate relations with Chester Raley. She admitted that she had seen the gun several times down at the cafe where he would have it in his pocket. He didn't carry the gun all the time. Once he brought it to her house and she kept it for him in the chifferobe drawer. She admitted that a couple of days after Chester Raley was killed she talked to Sheriff Tom Head and a Mr. Prier and she admitted to them that she had known Chester Raley for four or five years and had been going with him during that time and that she admitted that there had been times when she would keep the pistol in her purse in the cafe when he would take his coat off. She denied that she had killed Chester Raley or that she had made any threats or had any difficulties more than arguments with Chester Raley prior to the killing.

C. S. Prier, witness for the state, testified on rebuttal for the state, that he was present with Tom Head, the Sheriff, when Bertha Ellison made a statement to them. She stated that Chester Raley had a .38 caliber revolver and she kept it for him on a number of occasions, that Chester Raley would have this pistol on him when they would go in a cafe and if he took off his coat after entering the cafe, he would hand her the pistol and she would then put it in her purse. She first stated that she did not have an argument with Chester Raley in Raley's Cafe on the night of the killing, then later stated that they did have a fuss. However, she stated to them that she did not kill Chester Raley. She told them that she was walking down the street and that he said to her that he had nothing to live

for and then she heard the gun fire. When she looked around he was lying in the street. She admitted further on cross-examination that in 1926 she was convicted in Montgomery County of murdering her baby.

■ There is but one issue in this case and that is whether or not Bertha Ellison killed Chester Raley. She undoubtedly had the opportunity to do the act but opportunity without more is not sufficient. Lang v. State, supra. Beyond that we do not think the proof sufficient. No one saw her fire the pistol. There is no proof of threats. There is some proof of prior argument and fussing but only the vaguest evidence as to a previous difficulty. The undertaker while perhaps an expert on the effect of embalming fluid on powder burns is not shown to be qualified as an expert on gun fire and its effect at various distances as to powder burns. There is no proof in this regard where the pistol is held at contact with the head. See Jefferson Standard Life Ins. Co. v. Wigley, 248 Ala. 676, 29 So. 2d 218.

■ Immediately after the pistol fired she was seen crying in the street and trying to get help saying that the man had shot himself. She did not try to escape in the darkness and after she aided in carrying the wounded man to the hospital, she went first of all to the brother of Chester Raley. She never changed her version of the shooting even in the presence of the officers. When taken with the testimony of witnesses who testified as to the suicidal inclinations of the deceased, Pearce v. State, 226 Ala. 436, 147 So. 617, the evidence is insufficient to exclude to a moral certainty every reasonable hypothesis but that of guilt. The proof is not of that conclusive character demanded by the law. The motion for a new trial should have been granted. Authorities supra.

Reversed and remanded.

FOSTER, LIVINGSTON and SIMPSON, JJ., concur.