238 So.2d 908

**Leon JOHNSON**

v.

**STATE.**

7 Div. 8.

Court of Criminal Appeals of Alabama.

Aug. 25, 1970.

William D. Scruggs, Jr., Fort Payne, John M. Baker, Rainsville, for appellant.

MacDonald Gallion, Atty. Gen., and Richard F. Calhoun, Asst. Atty. Gen., for the State.

ALMON, Judge.

Leon Johnson was indicted for murder in the first degree. The indictment charged that he killed his neighbor, Anna Ruth Downer, by shooting her with a rifle. The jury found him guilty of murder in the second degree and fixed his punishment at twenty years in the penitentiary.

The facts as set out in appellant's brief, which were accepted as correct by the Attorney General, are as follows:

"The first witness called for the State of Alabama was Mr. Homer Downer the husband of the late Anna Ruth Downer. Mr. Downer testified that he and Mrs. Downer got up around 5:00 or 5:30 a. m. on the day in question (February 3, 1968) and that his son, David, and his daughter-in-law, Frances came about 9:30 a. m. * * * Mr. Downer said that a man named Mack Smith came about 10 or 15 minutes after 12:00 noon and immediately after Mr. Smith arrived, Mr. Downer, David and Mr. Smith went hunting at Geraldine. * * * He stated that they arrived home between 4:00 and 4:15 p. m. and that at that time, he found his wife dead on the living room floor. Mr. Downer said that he then called the Sheriff immediately. * * *.

"The second witness called for the State of Alabama was Mrs. Frances Downer, daughter-in-law of the late Anna Ruth Downer. She testified that she was at the Downer home on February 3, 1968, from about 10:00 a. m. until between 1:15 and 1:30 p. m. at which time she left. She said that when she left, Mrs. Downer was baking cakes. * * *.

"The third witness called on behalf of the State of Alabama was Sheriff Harold Richards. Sheriff Richards testified that he went to the Downer home about 4:30 P.M. on February 3 and that Mrs. Anna Ruth Downer was lying dead on the living room floor face down. * * * Richards stated that upon examination he found six holes in the storm door, through the glass. * * * The Sheriff said he found blood on the hall wall leading to the living room and some on the floor going into the living room. * * * He said

that he found four spent cartridges on the front porch and one on the ground. Richards testified that on this occasion he went to the Defendant's residence [which was approximately 150 to 200 yards from the residence of deceased] and that the Defendant was under the influence of alcohol. * * * He stated that Mrs. Johnson said she went over to her mother's after lunch, and as she came back around 4:00 she met Jesse Sanders near the house [driving an old green car]. The Sheriff said that Mr. Johnson stated he had been in bed drunk all afternoon and that he didn't own a rifle or a gun. * * * Richards testified that he later returned to Johnson's house advised him of his constitutional rights and that the Defendant said he wouldn't sign the waiver of rights but that he would answer any questions. * * * The Sheriff said that he told the Defendant that he had found out the Defendant did have a rifle and that the Defendant said that he did but that someone must have stolen it while he was in bed drunk. * * * He stated that Judge Glenn issued a search warrant and that Mr. Noles arrested the Defendant afterwards and that a second search warrant was issued on the shells they found and the statement of the Defendant's daughter that her father did own a rifle and that he had it that afternoon; and that the Defendant said it was a .22 automatic, but that they did not find anything. Sheriff Richards said that on February 4 (the following day) he found a rifle in a drilled well in the back yard of the Defendant's residence, * * * also, that there was no way to tell whether a shell is fired from a single action or an automatic by looking at it. * * * Richards testified that they worked on the case a month or two but that they did not have any other suspect besides the Defendant. * * * He said that he could not tell what time Mrs. Downer had been shot. * * *.

"The fourth witness on behalf of the State was Raymond Scott. Mr. Scott testified that the Defendant came to his house in December of 1967 and stated that the Downers had turned him in for bootlegging. * * *.

"The fifth witness for the State was Mr. George H. Noles, Investigator for the Sheriff's Office. Mr. Noles testified that Sheriff Richards had turned some .22 cartridges over to him on the 4 of February and that he gave them to Mr. Vann Pruitt, the State Toxicologist. * * * He then stated that he had a conversation with the Defendant on the 4 of February in his office and that he apprised the Defendant of his rights. He stated that he asked the Defendant if he wanted to talk and the Defendant said that he didn't, and that he then showed the gun to the Defendant and asked the Defendant if the gun was his and that the Defendant said yes. * * * He stated that the Defendant said the gun had been bursted on the end since he had seen it. * * * Upon questioning, Mr. Noles testified that there would be many .22 rifles in DeKalb County. * * *.

"The sixth witness for the State was Mr. Vann Pruitt, Jr. Mr. Pruitt testified that he performed a post-mortem examination on Mrs. Anna Ruth Downer and that, in his opinion, her death was caused by ten [some of these were probably exit wounds] gun shot wounds which caused injury to the heart and wounds sustained to the chest. * * * He stated that on the 4 of February, George Noles turned over him a gun and two separate envelopes one containing two lead slugs and the other containing five spent .22 cartridges cases. He said that the slugs and cartridges were in the same shape substantially as when they were first turned over to him. Mr. Pruitt said that, in his opinion, the shells were fired from the gun found in the well. * * * Mr. Pruitt said that he had no judgment whatsoever of the time of Mrs. Downer's death. * * * Mr. Pruitt said that he was not able to tell when a gun has been fired last, and that he would not be able to compare any two shells under the con-

ditions of mutilation which the particular slugs showed. * * *.

"The seventh witness on behalf of the State was Miss Donnie Johnson, daughter of the Defendant. Miss Johnson testified that on February 3, her father came home around lunch time and asked his wife, Mrs. Johnson, to get him his rifle, and that he had been drinking heavily. * * She said that after her father got home, Doc Vaughn and Pete Thompson came and they and the Defendant went to the barn and drank together. * * * She stated that she went to a friend's and stayed until about 4:00, and that when she got back, the Defendant was in bed asleep. * * * She testified that she believed the stock of her father's gun was lighter than the gun in question. * * *.

"The State rested and the Defendant did not offer any testimony."

Appellant's motion to exclude the State's evidence and motion for a new trial were denied by the trial court.

Appellant insists that the State's circumstantial evidence case does not show his guilt by a full measure of proof. He relies on the following cases: Ex parte Acree, 63 Ala. 234; Jordan v. State, 229 Ala. 415, 157 So. 485; Cooper v. State, 235 Ala. 523, 180 So. 102; Lang v. State, 252 Ala. 640, 42 So.2d 512; and Ellison v. State, 254 Ala. 428, 48 So.2d 176.

After a careful consideration of these cases and the transcript of evidence, we conclude the trial judge was correct in submitting this case to the jury.

George H. Noles, an investigator for the sheriff's office testified as follows:

"Q. Prior to the conversation with Leon Johnson did you or anyone make any threats toward him?

"A. No, sir.

"Q. Did the Sheriff, or you, or anybody else in your presence make any threats toward him?

"A. No, sir.

"Q. Did anyone offer him any reward or immunity to get him to make a statement?

"A. No, sir.

"Q. Did you apprise him of his rights at that time?

"A. Yes, sir.

  *    *    *    *    *    *

"Q. Do you have the copy that you read to him or a similar copy?

"A. This is the one.

"Q. Read it to the Court and Jury, please.

"A. 'Before we ask you any questions, you must understand your rights. 1. You have the right to remain silent. 2. Anything you say can be used against you in Court. 3. You have a right to talk to a lawyer and have him present with you while you are being questioned. 4. If you cannot afford to hire a lawyer, one will be appointed for you before any questioning, if you wish.' Then on the other side—'If you decide to another questions now without a lawyer present, you will still have the right to stop answering at any time.' I asked him if he understood his rights.

"Q. What did he say?

"A. He said he did.

  *    *    *    *    *    *

"Q. When you asked him if he understood his rights that you had explained to him what if anything, did he say?

"A. He said he did.

"Q. Did you ask him any other questions?

"A. I asked him if he wished to talk to us now. He said he didn't.

"Q. He said he didn't?

"A. He said he didn't.

"Q. Did he make any statement at all to you at that time?

"A. We showed him the gun.

"Q. What did he say?

"A. He said it was his. He said it had been bursted on the end since he saw it.

"Mr. Black: You may ask him.

"CROSS EXAMINATION

"Examined by Mr. Hanes, Sr.

"Q. Let's get this straight. Did he say he didn't want to make any statement?

"A. Yes, sir.

"Q. He didn't want to talk any further about the gun, but you went on and asked him some questions any way?

"A. *Well, we asked him if that was his gun, if he had seen that gun before, and if it was his, and then is when he said he didn't want to talk any more.*

"Q. So he didn't want to talk any more?

"A. That is right.

"Q. Did he say it was or wasn't his gun?

"A. He said it was his." (Emphasis added)

Appellant argues that the custodial interrogation violates the standards set forth in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, because Noles continued to question appellant after he indicated that he did not wish to talk anymore.

Even though the record is not absolutely clear as to the order of questions, we conclude that a reasonable interpretation of the above-quoted testimony is that appellant made the statement that he owned the gun prior to indicating his desire not to be questioned anymore.

Affirmed.