62 So.2d 805

**PACIFIC MUT. LIFE INS. CO. v.
YELDELL.**

**6 Div. 595.**

Court of Appeals of Alabama.

Jan. 13, 1953.

Spain, Gillon, Grooms & Young, H. H.
Grooms and R. Foster Etheredge, all of
Birmingham, for appellant.

654

Cabaniss & Johnston, Birmingham, for appellee.

655

CARR, Presiding Judge.

The appeal in this case arises out of a suit brought by Mrs. Floy Baucum Yeldell, beneficiary, against the Pacific Mutual Life Insurance Company, insurer, on a policy of life insurance.

The policy was issued on November 7th, 1950. The insured came to his death on May 21st, 1951.

The defense in the case is suicidal death of the insured with no liability by virtue of the following clause contained in the policy:

"The suicide of the Insured, sane or insane within two years of the date of the issue of this policy is a risk not assumed under this Policy. In such event, however, the Company will pay to the beneficiary in one sum an amount equal to the premiums received hereon, without interest, and this policy shall thereupon be terminated."

The trial of the cause resulted in a verdict and judgment in favor of the beneficiary.

The death of the insured was caused by a fall from a window in a rest room on the twelfth floor of the Watts Building in the city of Birmingham, Alabama. The dead body was discovered hanging on the parapet wall of a three-story building north of the Watts Building and about six feet from the Watts Building.

The question of prime factual concern is whether the fall was the result of an intentional, suicidal act or accidental.

Mr. Yeldell, the deceased, was first employed by the Southern Natural Gas Company in 1930 as a chart changer. He was generally liked by all of the employees of the company. Because of his excellent ability and efficient service he received a number of promotions which were reflected in position rating and salary increases. At the time of his death his annual salary was $18,500. His duties did not require that he handle any of the funds of the company. When he died he was 45 years of age and in good standing in every respect with his employer.

He did not gamble, run around with women, or drink intoxicating liquor to excess.

His family consisted of his wife and three children. His oldest child is a girl. At the time of her father's death she was 18 years of age and a student at Huntingdon College in Montgomery, Alabama. His other two children are boys, ages 14 and 9.

The evidence makes it certain that Mr. Yeldell enjoyed a happy, congenial, and contented family life.

In 1944 or 1945 he was stricken with a malady which caused considerable pain and discomfort in his back. The trouble continued until a ruptured disc in the fourth lumbar segment was removed by surgical operation on November 4th, 1949. Apparently after the effects of the operation were over he was relieved of the pain, but there remained a slight stiffness in his back. This was not very noticeable, but it did interfere to some extent with his normal physical movements.

In July 1950 the insured was in an automobile accident in which he sustained serious and painful injuries, but none of these was permanently disabling in effect. While he was being treated for these injuries he developed traumatic pneumonia.

According to the testimony of the attending physicians, he enjoyed a satisfactory recovery with an exception which is described by Dr. Givhan. This is fairly and accurately set out in brief of appellant's counsel. We copy:

"When he came back on March 31, 1951, he had a swelling of the right ankle and a discoloration of the right side of his abdomen; that on a previous visit to him in November he had a heart reading of 90 and blood pressure of 130 over 85 and an area of discoloration in the right flank. When he saw him on the 31st of March he had the swelling of the ankle and the discoloration of the right flank; that 72 was the normal pulse rate; that as to whether or not he was worried about his condition on March 31st, he got the impression he was worried somewhat and that there were two or three things that went into his mind. One of them was whether he should make settlement on his insurance claims; that he wanted to be sure there would be no return of the fluid and he was upset about the lump in his side— whether there was any permanent damage there; that he, the witness, did not think that there was; that he made a finding on March 31st that he was suffering from general malaise, fatigue and a rapid pulse and also thought that he had suffered a post traumatic neurosis; that he had the impression Mr. Yeldell was afraid he had received some permanent damage to his kidney or something; that neurosis was a condition of the nerves; that he thought Yeldell's rapid pulse rate was contributed to by the neurosis * * *."

It should be noted that in the automobile wreck Mr. Yeldell's immediate superior in line of employment was killed, and that the car at the time was being driven by a company chauffeur.

Mr. Yeldell carried a rather large life and life and accident insurance coverage. By the terms of some of these policies accidental and not suicidal death increased the benefits.

We have given very careful study to the facts and circumstances relating to the issuance and carriage of these contracts. It appears that some of them had been in existence for a number of years. Some were group policies which were carried in

substantial part by the Southern Natural Gas Company.

The policy which forms the basis of this suit was issued about six months prior to the death of the insured, but it was taken out after considerable solicitation by the agent who was a personal friend of Mr. Yeldell.

The evidence we have herein above delineated may be appropriately characterized as tending to establish motive and absence of motive for suicide.

■ The authorities are committed to the doctrine that it is not necessary to prove motive to establish suicidal death in defense of pertinent provisions in insurance contracts.

46 C.J.S., Insurance, § 1358, page 559, states the following rule:

"Proof of motive is not required in establishing suicide. Although a motive or its absence is not conclusive, it is a circumstance of major importance to be considered in determining whether or not death was the result of suicide, and, where the evidence between accident and suicide is evenly balanced, motive or lack of motive is decisive. In the absence of direct evidence of eyewitnesses, suicide notes, or previous declarations, the physical surroundings must be subordinated to evidence as to motive. Motive may be established by circumstantial evidence, and, where proof of motive is essential to overcome the legal presumption against suicide, the pleader must establish motive by a clear preponderance of the evidence."

In the case of International Life Insurance Company v. Carroll, 17 F.2d 42, 50 A.L.R. 362, the U. S. Circuit Court of Appeals, Sixth Circuit, held in effect that the burden of proving suicide in an action on a life insurance policy is not sustained by proof of motive, if the circumstances indicating the probability of self destruction also established facts which are equally consistent with the probability of accidental death. See also, Webster v. New York Life Ins. Co., 160 La. 854, 107 So. 599.

When the evidence relating to the health of the accused is carefully considered we are unable to find any factual circumstances which would indicate that on this account Mr. Yeldell was driven to the unnatural extremity of taking his own life. He was still in the middle-age period of a normal life expectancy. His physicians had given him every assurance that his prior physical illness had been arrested and a recovery could be expected. He returned to the active duties of his employment and assumed the responsibilities which his position demanded several months prior to his death.

Mr. Yeldell's financial ability permitted him to carry a large insurance coverage. There is no evidential indication that this program or any part thereof was planned anticipatorily to self destruction.

The record is abounding in evidence which tends strongly to establish a lack or absence of motive for the insured to commit suicide.

On the day of his death, after a good night's sleep, Mr. Yeldell had breakfast with his wife and two sons. He left home for his office about 8 A.M. and after telling his wife good bye said to her, "I will see you this afternoon."

During the forenoon of this day, the insured was actively and busily engaged in the affairs incident to the duties of his employment. From 10 A.M. to noon he attended a regular, scheduled operating meeting. The business of this conference had to do with discussions and decisions relating to both current operating matters and future planning. Several of Mr. Yeldell's employee associates testified at the trial below. From their testimony it is convincingly clear and abundantly established that during this forenoon the insured was normal in every respect and devoted his interest and attention to the matters of business in his usual and accustomed manner.

He went to lunch at noon and was joined by a fellow employee at the restaurant.

We think that it is pertinent and appropriate to set out the evidence somewhat in detail at this point. We copy a fair and

accurate delineation of the circumstances from appellee's brief:

"After lunch, somewhere around 1:00 or 1:15 P.M., Mr. Clark saw Mr. Yeldell in the Dispatcher's office, and showed him a chart which appeared in Mill and Factory Magazine, setting out the procedure in securing approvals and getting material, and he showed this chart to Mr. Yeldell. The latter said he had the magazine in his office, and thereupon went to his office, came back out with a sheet in his hand and told Mr. Clark that he had found it and that he was going back down to Louis Brown's office, and he then walked down the hall towards the elevator. He appeared perfectly normal.

"On his way down the hall, at about 1:20 P.M., Mr. Yeldell stuck his head into the door in the Dispatching Department and asked about the line break. He was told that the trouble had been fixed, and he then remarked that he was going down to Louis Brown's office. He appeared perfectly normal at that time.

"The office of Louis Brown, the Chief Engineer, is on the twelfth floor of the building. Some time after 1:00 o'clock Mr. Yeldell came into Mr. Brown's office, bringing with him the chart from Mill and Factory Magazine, and discussed at greater length with Mr. Brown the procedures for obtaining material under the regulations. This discussion covered a period of probably ten to fifteen minutes. Mr. Yeldell discussed this problem intelligently and his mind was not preoccupied or distracted. A Mr. Walsh, who was a representative of Johns-Manville Sales Corporation, was sitting in Mr. Brown's outer office, and went in to see Mr. Brown when Mr. Yeldell left through another door which opened directly onto the corridor.

"At about 1:30 P.M. Mr. Terrell, another official of Southern Natural Gas Company, telephoned Mr. Yeldell in the latter's office, and talked with him for about five minutes concerning a company problem. Mr. Yeldell's mind appeared to be on the business at hand and they reached a satisfactory solution of the problem.

"Mr. Walsh stayed in Mr. Brown's office for about ten or fifteen minutes. He was sitting with his back towards the corridor door, and he heard that door open, whereupon Mr. Brown looked up and said, 'I will be with you in a minute, Jim,' and he heard someone else say, 'I will be back in just a minute.' Mr. Walsh turned around and saw the door closing. He thought he recognized Mr. Yeldell's voice and he told Brown not to let him interfere, as he was through with his business, whereupon they went out the door into the corridor and walked to the elevator lobby. As they got to the lobby, they saw Mr. Yeldell about to enter the washroom, which is located off the elevator lobby. He had the door partially open. Mr. Walsh spoke to him, and Mr. Yeldell recognized him, walked back towards him, shook hands, asked him how was business, and a few other trivial things, and they chatted a few minutes, and then Mr. Yeldell said to Mr. Brown that he would be with him in just a minute, and he went into the washroom, Mr. Brown went back to his office and Mr. Walsh rang for the elevator. At that time Mr. Yeldell appeared just as usual, there was nothing unusual in his appearance, actions or speech. There was nothing unusual in Mr. Yeldell coming to Mr. Brown's office, he would often do that."

The reference above to Mr. Yeldell's entrance into the washroom marks the location of the window from which he descended. Apparently he was in the rest room only a short time. The rest rooms in the building were not air conditioned, and the windows therein remained open during the summer months.

The sill or casement of the window of concern is 2 feet and 5 inches from the floor level of the room. A stool on top of the casement is about 1½ inches in thickness. When the window sash is pushed up as far as it will go, the opening thus made has these dimensions: Height 2 feet 7

inches and width 2 feet 8½ inches. The base or sill of the window does not extend in width beyond the outside wall of the building. Neither is there a ledge which projects beyond the outer wall.

Ed Hickerson testified that as he was coming out of a restaurant onto the sidewalk he observed a human body falling along the side of the Watts Building. His view was soon obscured by another structure. Apparently he lost sight of the falling body as it passed about the seventh floor of the Watts Building. The witness stated that his brief observation disclosed that the body was in a horizontal position; the face up; head towards the Watts Building; hands extended towards the head; and the body bowed slightly. He approximated the time as about 1:40 P.M.

In support of its insistence that death was suicidal, appellant places much emphasis on the testimony of Joe Blackburn. The witness testified that he was standing on the sidewalk at a vantage point from which he could see the Watts Building. The pertinent parts of his testimony follow:

"Q. Now, when you looked up there, Mr. Blackburn, what attracted your attention, or what did you see up there? A. Well, what I seen was a man in the window.

"Q. Well, how was he in the window? You say he was in the window, was he standing in the window? A. That is the way it appeared to me, sir.

"Q. How long did you watch him there? A. Well, I guess a minute, or about 12 or 15 seconds, something like that.

"Q. Then did you see what the man did then? A. Yes, sir; he just toppled forward.

"Q. Toppled forward like that (illustrating)? A. Yes, sir.

"Q. Now, could you see the place of his head? Did his head appear to be up to the top of the window, or about the top of the window when you looked up there? A. Yes, sir, it did.

"Q. Now, when you saw the man did it appear that his body was outside? That he was standing in the window?

A. That is the way it looked to me, sir.

"Q. And it attracted your attention, is that correct? A. Yes, sir.

"Q. Now, did you see him after he started down? Could you tell anything about how he went down? Did he make any change—first, let me ask you this: As he went out of here did you see any grabbing, or struggling, or anything like that? A. No, sir, I didn't.

"Q. Did you hear any noise, or anything, or any yell, or cry of anguish? A. No sir, I didn't.

"Q. Or fright. Now, as he went down, could you tell about how he went down? Did he go down—A. He just toppled forward, and went like that (illustrating). And the last I saw him—

"Q. Seemed like he turned back under? A. He was about like this when I seen him last (illustrating with hands).

"Q. He toppled out you said? A. Yes, sir.

"Q. Did it appear to you he turned over like that (illustrating)? A. No, sir, I couldn't—the last time I seen him he was like this (illustrating).

"Q. Could you see where his hands were, Mr. Blackburn? A. Well, they seemed to appear at his side, almost.

"Q. It looked like his hands were along to his sides from where you were? A. From where I was at, yes, sir."

On cross examination the witness stated that he could not see the person's feet, but he was unable to say how much of the legs below the knees was invisible to him.

The credibility of Blackburn's testimony was attacked by his admission that he was convicted of the offense of larceny in 1941; by proving prior contradictory statements; and by contradicting his testimony at the trial by that of other witnesses.

It appears that the operating business of the gas company was related in a large measure to weather conditions. Several of the employees of the company testified that on numerous occasions they had seen Mr.

660

Yeldell go to an open window in the building, put his hands on each side of the window frame, and lean out far enough to observe the indications of conditions of the weather.

■ A review of the sufficiency of the evidence to sustain the judgment below is presented by the propriety of the refusal of the general affirmative charge and the action of the trial judge in overruling the motion for a new trial.

The rules by which we are governed in these reviewable aspects are stated in McMillan v. Aiken, 205 Ala. 35, 88 So. 135, and Cobb v. Malone, 92 Ala. 630, 9 So. 738.

■ In cases of instant concern the presumption of law is against suicide, and, when the insurer asserts this defense, the burden of proof rests on it to reasonably satisfy the jury by the evidence that the insured came to his death in this manner. Sovereign Camp, W. O. W. v. Dennis, 17 Ala.App. 642, 87 So. 616; Fleetwood v. Pacific Mutual Life Ins. Co., 246 Ala. 571, 21 So.2d 696, 159 A.L.R. 171.

The basis for this presumption is derived from the knowledge of experience and observation that men love life and abhor death.

Therefore, when the cause of death is unknown, we have a right to infer that it was not the result of self destruction. This is not an invariable premise. Persons do commit suicide. This we know. However, it is a legitimate inference which may be used in the process of reasoning to arrive at the ultimate fact. In its nature, the presumption rests upon human experience, therefore it is only applicable and controlling in the absence of proof of the actual cause of death.

■ When there is positive and convincing evidence of suicide, and there is no conflicting inference to the contrary, there is no field of operation for the doctrine of presumption against suicide. Fleetwood v. Pacific Mutual Life Ins. Co., supra; Jefferson Standard Life Ins. Co. v. Wigley, 248 Ala. 676, 29 So.2d 218.

Unquestionably in the case at bar the factual circumstances form a foundation for the application of the rule of presumption.

■ We will not attempt to analyze the evidence in any extended degree of detail.

We should not fall into error by adopting at the outset that doctrine known in logic as "petitio principii." That is to say, we should not take for granted that the insured came to his death by suicide, or for that matter by accident, and form an opinion solely on the basis of this assumption.

The evidence relating to the circumstances prior to the time of death affords no substantial basis for the conclusion that the insured committed suicide. We have attempted to illustrate this view hereinabove.

The solution of our task must be directed in the main to the proof which relates to the facts and circumstances incident to the immediate cause of death. In this aspect the physical conditions must play an important, determinable role.

Mr. Yeldell was an unusually large person. He weighed 230 pounds and was 6 feet and 8¾ inches in height.

It seems highly unlikely that he was in the act of falling from some cause inside the rest room, and, in an effort to recover his normal physical position, fell through the comparatively small opening in the window. This view, however, does not remove all other probable circumstances which could have resulted in an accidental fall.

Appellee's counsel in brief states: "It is obvious that Mr. Yeldell was leaning out of the window, and either became over-balanced, or his foot slipped, or he had a sudden attack of dizziness or vertigo, causing him to fall out head first and turn a complete somersault before striking the wall."

These suggestions may be characterized as mere surmises or conjectures, but, under the evidence, they come within the realm of reasonable probabilities.

The jury was not authorized to capriciously reject or ignore the testimony of the witness Blackburn, but it had a right to weigh it in the light of the proof affecting its credibility.

We do not conclude that the factual theory of accidental death is entirely dispelled by the testimony of this witness. His vantage position furnished a line of vision

from a point some distance from the base of the Watts Building to a place on the twelfth floor of said building.

Because of the angle and distance of visibility, and the unusual height of Mr. Yeldell, the witness could have been impressed that the insured was standing outside when, as a matter of fact, he was only leaning out of the window. The reasonable probability of this impression is augmented by the fact that the base of the window was only 2 feet and 5 inches from the level of the rest room floor and the witness could not see Mr. Yeldell's feet.

Chief Justice Marshall observed in Ogden v. Saunders, 12 Wheat. 213, 6 L.Ed. 606: "It is a general rule * * * that the positive authority of a decision is co-extensive only with the facts on which it is made."

We do find that the circumstances relating to the immediate cause of death in the case of Valesi v. Mutual Life Ins. Co. of New York, 151 La. 405, 91 So. 818, are quite similar to those in the case at bar. The Supreme Court of Louisiana held that suicidal death was not proven with that certainty necessary to sustain the defense.

The case of Pecoraro v. New York Life Ins. Co., La.App., 141 So. 501, in some aspects is analogous to the case at bar.

We find no difficulty in reaching the conclusion that the appellant was not due the general affirmative charge.

We have studied the evidence with considerable care and have given due consideration to oral arguments and briefs of counsel. On the authority of Cobb v. Malone, supra, and *many* decisions that have followed, we are unable to reach the conclusion that we should disturb the ruling of the trial judge upon the motion for a new trial.

■ At the request of the appellant the court gave the following written instruction:

"14. The Court charges the Jury that if there is a single member of this Jury who, after considering all the evidence in this case, is not reasonably satisfied that plaintiff ought to recover a verdict, then you should not render a verdict in favor of the plaintiff." McCalley v. Penney, 191 Ala. 369, 67 So. 696.

As a counterpart to this instruction the appellee tendered and the court gave this written charge:

"4. I charge you that if you believe the evidence, you cannot find a verdict for the defendant if there is a single member of the jury who, after considering all the evidence in this case, is not reasonably satisfied therefrom that Mr. Yeldell committed suicide."

If the latter charge is misleading in tendency, as the appellant urges, an explanatory instruction should have been requested. Williams v. Roche Undertaking Co., 255 Ala. 56, 49 So.2d 902; Emergency Aid Life Ass'n v. Gamble, 34 Ala.App. 377, 40 So.2d 887.

■ To attempt to establish motive for suicide as a factual circumstance, the appellant inquired much in detail concerning the insurance program of Mr. Yeldell.

On cross examination appellee asked a witness the following question:

"Mr. McInnis, isn't it a fact that on the renewal of the Globe Indemnity Company Policy on August 26, 1949 five of the key employees of Southern Natural Gas Company were given the right or could have increased their coverage to $100,000, and that Mr. Yeldell could have increased his coverage to $100,000, had he so desired?"

Over objections the witness answered in the affirmative and also stated that Mr. Yeldell was among the five key employees of the gas company who were thus privileged.

It appears that the indicated Globe Indemnity Company contract was a group policy. The gas company paid the premium costs for $20,000 accidental death coverage. Appellant proved by Mr. McInnis that in August 1950 Mr. Yeldell increased this benefit from $35,000 to $40,000.

This evidence in this form was favorable, of course, to appellant's contentions. To lessen the impact or force of the detrimental inference, the appellee was properly

allowed the opportunity to show that the increase to $40,000 did not reach the amount of privileged coverage.

The ruling of the court comes under the influence of that long line of authorities which hold that when one party introduces evidence relating to a part of a transaction the opposing party may call for the whole transaction and thus explain or clarify, if possible, the harmful effects of the initial evidence. 6 Alabama Digest, Criminal Law, ☞396(1) (2); 9 Alabama Digest, Evidence, ☞155(1).

 According to the evidence, the witness Blackburn was standing on the street not a great distance from the witness Hickerson when the former saw Mr. Yeldell at the window and the latter observed the falling body. In an effort to discredit the testimony of Blackburn, the appellee sought to show that Blackburn did not make his observation known to anyone there on the streets.

On cross examination the appellee asked Hickerson this question: "As a matter of fact, you had great difficulty convincing anybody that you had seen it?"

The insistence that this called for the mental operation of other persons or the opinion of the declarant cannot be sustained in view of the fact that only the general objections were interposed to the question. Marshall v. State, 219 Ala. 83, 121 So. 72, 63 A.L.R. 560.

This aside, we do not think that the answer was in any manner injurious to the rights of the appellant. Supreme Court Rule 45, Code 1940, Tit. 7, Appendix.

As we have indicated hereinabove, the evidence showed that the insured was frequently observed when he was looking out of windows of the rest rooms in the Watts Building. This proof went into the record without objections.

 Assignments of error 17 and 21 relate to the rulings of the court in permitting witnesses to answer, "How did he look out the window * * * ?" and "* * * how you have observed him looking out of a window?"

The reply to the first query was:

"I have seen him various ways. Sometimes he would put his hands on the window sill and put his head out the window and look at the weather conditions, and sometimes he would put them up on the sides of the window and look out."

The answer to the second was to like effect.

It is evident that the determination of the cause of death of the insured depended in a large measure on circumstantial evidence. This permitted a wide latitude in the introduction of circumstances which tended to establish a reasonable probability of the cause or effect of the fact of ultimate concern.

The record evidence sustains the factual theory that Mr. Yeldell was caused to fall while he was looking out of the rest room window.

Human experience and observation convince us that the practice of a continued custom produces, more or less, a habit and creates an automatic reaction to mental and physical stimuli. The simple things we frequently do are generally done in the same way or routine.

We think that it was conducive to the proof of the pertinent hypothesis to show the usual position and posture the insured assumed when he looked out of the windows. Particularly so, since this mannerism set up a situation or condition which was consistent with a reasonable possibilty of the cause of the fall.

There are some authoritative analogies found in the opinions in the cases of Blue v. State, 246 Ala. 73, 19 So.2d 11, and Sovereign Camp, W. O. W. v. Dennis, supra, and other cases cited therein.

 The ruling of the court made the basis of assignment of error number 23 relates to overruling an objection to a question which called for a yes or no answer. If either of these responses had been made, no harm would have inured to the rights of the appellant. The reply, however, was not responsive, but there was no motion to exclude it.

Immediately following the answer, appellee propounded this question to the witness: "Did he say something about being lucky he was as well off as he was after the automobile accident?"

Reference was here made to the insured.

Over the general objections the court allowed the witness to answer in the affirmative.

We think this inquiry related to material testimony in rebuttal to that elicited by the appellant. It was not, therefore, patently and palpably inadmissible for any purpose. This being true, special objections pointing out the grounds of its irrelevancy or illegality should have been interposed. Williams v. Bolding, 220 Ala. 328, 124 So. 892; Chandler v. Goodson, 254 Ala. 293, 48 So.2d 223; Grissom v. Dahart Ice Cream Co., 34 Ala.App. 282, 40 So.2d 333; Baker v. State, 35 Ala.App. 596, 51 So.2d 376.

 Assignment of error number 25 relates to the action of the trial judge in overruling appellant's objections to the admission of the death certificate of the insured.

Assignment 26 bases claim for error in the court's action in overruling objections to the admission of Answer 21–a of said certificate. The indicated answer gives the cause of death: "Accident."

Assignment 31 poses the position that the court was in error in denying appellant's motion to exclude the certificate after it had been allowed in evidence.

These assignments relate to kindred questions and are properly argued in brief in group. B. F. Goodrich Co. v. Hughes, 239 Ala. 373, 194 So. 842.

The evidence supports the position that the coroner gave the cause of death in the certificate without an investigation of the circumstances incident to Mr. Yeldell's fall. That is to say, he did not talk to or examine any of the parties who had any knowledge of these facts.

In this jurisdiction there are two statutes under the provisions of which death certificates are made admissible as prima facie or presumptive evidence of the facts therein contained—Title 7, Sec. 386, and Title 22, Sec. 42, Code 1940. The latter section was amended by Act No. 492, Acts of 1943, p. 454. It appears in its amended form in the pocket part of the current code.

There is not an unanimity of views among the various jurisdictions with reference to the admissibility of a death certificate when the circumstances incident to its issuance are comparable to those in the case at bar. This is pointed out and discussed in the case of Carson v. Metropolitan Life Ins. Co., 156 Ohio St. 104, 100 N.E.2d 197.

This seems to be true when similar state statutes are applied.

In our own jurisdiction it appears certain that the question has been settled adversely to the contention of the appellant. Because of the length to which this opinion has already been extended, we will not attempt to illustrate this view by analyzing or discussing the conclusions reached by our appellate courts in former adjudications. A citation of some of the cases will avoid the necessity for further comment. Metropolitan Life Ins. Co. v. Parks, 210 Ala. 261, 97 So. 788; Fleetwood v. Pacific Mutual Life Ins. Co., supra; Jefferson Standard Life Ins. Co. v. Wigley, supra; Liberty National Life Ins. Co. v. Tellis, 226 Ala. 283, 146 So. 616.

 According to the record this occurred during argument of appellee's counsel:

"Mr. Clark: Now, he says he doesn't want you to give a verdict based on your sympathy. We don't either.

"We could have tried this case differently; we haven't tried to base it on sympathy, gentlemen.

"We could have brought that precious daughter of Jim Yeldell's, and we could have brought those boys and put them out in the courtroom to wring your hearts.

"Mr. Grooms: We object to that; that is an unfair argument.

"The Court: Overrule the objection.

"Mr. Grooms: We except."

Assignment of error number 33 predicates claim for error on the action of the court in overruling objections to the statement contained in the last paragraph just quoted above.

It is not made certain that the objection was directed solely to this assertion. For aught appearing, the trial judge may have thought that the statements just preceding were also included.

It is the duty of counsel to point out to the trial court the portion of the argument deemed objectionable. Ferguson v. State, ante, p. 358, 56 So.2d 118.

Clearly all of the above quoted statement was not subject to objections. Louisville & N. R. Co. v. Hurt, 101 Ala. 34, 13 So. 130; Jordan v. State, 225 Ala. 350, 142 So. 665; Tennessee Valley Sand & Gravel Co. v. Pilling, 35 Ala.App. 237, 47 So.2d 236.

All this aside, we do not think there was error in the ruling if we confine our review to that portion which is set out in the assignment of error. The fact that Mr. Yeldell had a daughter and two sons was established by the evidence. Beaird v. State, 219 Ala. 46, 121 So. 38; Windom v. State, 18 Ala.App. 430, 93 So. 79; Doss v. State, 224 Ala. 90, 139 So. 290; Vincent v. State, 231 Ala. 657, 165 So. 844; Copeland v. Pope, 198 Ala. 257, 73 So. 490.

On reviewing the propriety of the argument we are not authorized to lift it entirely from its setting and isolate it from related or connecting remarks which had just preceded. It appears that it was a reply in kind in some aspects.

 The courts are very liberal in allowing argument when it comes under this characterization. Hines v. Paden, 204 Ala. 592, 87 So. 88; Elmore v. State, 21 Ala. App. 410, 109 So. 114; Gilliland v. R. G. Dunn & Co., 136 Ala. 327, 34 So. 25; Hanners v. State, 147 Ala. 27, 41 So. 973; Barney v. State, 5 Ala.App. 302, 57 So. 598; Roden v. State, 3 Ala.App. 193, 58 So. 74; McQueen v. Jones, 226 Ala. 4, 145 So. 440; Alabama Great Southern R. Co. v. Hill, 93

Ala. 514, 9 So. 722; Shewbart v. State, 33 Ala.App. 195, 32 So.2d 241; Walker v. State, 33 Ala.App. 614, 36 So.2d 117; Smith v. Reed, 252 Ala. 107, 39 So.2d 653; Alabama Power Co. v. Bowers, 252 Ala. 49, 39 So.2d 402.

 Over appellant's objections the court permitted the jury to go to the rest room on the twelfth floor of the Watts Building and observe the conditions of the locale at this place. It was established by the evidence that conditions of the room had not been changed since the death of the insured.

This permission addressed itself to the sound discretion of the trial judge, and clearly it was not abused in the instant case. Rutledge v. Brilliant Coal Co., 247 Ala. 40, 22 So.2d 428.

Despite the fact that the jury did view the locale, we have reviewed the propriety of the refusal of the general affirmative charge in appellant's behalf and the action of the court in denying the motion for the new trial.

This seems to us to be the fair and just approach to the review of these questions, when the permission to view the scene was granted over the objections of the appellant.

In the case of Rutledge v. Brilliant Coal Co., supra, the jury was permitted to view the premises involved in the litigation. Even so, the Supreme Court reviewed the action of the trial court in denying appellant's motion for a new trial, and held that the verdict of the jury was not contrary to the great preponderance of the evidence.

The foregoing disposes of each assignment of error which is insisted upon in argument of appellant's counsel.

We have been favored with very helpful briefs prepared and filed by attorneys for the appellant and appellee.

It is our considered conclusion that the judgment at nisi prius should be affirmed. It is so ordered.

Affirmed.