80 So.2d 288

### LOUISVILLE AND NASHVILLE RAILROAD CO.

v.

### C. E. TUCKER.

6 Div. 768.

Supreme Court of Alabama.

March 10, 1955.

Rehearing Denied May 19, 1955.

Gibson & Gibson, Birmingham, for appellant.

Hare, Wynn & Newell and Frank L. Parsons, Birmingham, for appellee.

STAKELY, Justice.

C. E. Tucker (appellee) instituted this suit against the Louisville and Nashville Railroad Company, a corporation, and J. W. Jones. The case was submitted to the jury on two counts. Count 1 alleges in substances that on to wit March 10, 1953, defendants were in charge or control of a railway locomotive and train at a point where the railroad tracks cross 8th Avenue,

a public highway in Cullman, Alabama, when the locomotive collided with a vehicle which plaintiff was driving on said public highway and as a proximate consequence of said collision plaintiff sustained severe and permanent injuries. The count alleges that the alleged injuries were the proximate consequence of the negligence of the defendants in causing or allowing said locomotive to collide with said automobile.

Count 2 was identical with count 1 except that it alleged that a servant or agent of the defendant acting within the line and scope of his authority as such wantonly injured plaintiff wantonly causing said collision thus proximately causing the injuries and damage. Count 2 further alleged that the defendants wantonly injured plaintiff on the date and at the place alleged by wantonly causing or wantonly allowing the locomotive to collide with the vehicle which plaintiff was operating so that as a proximate consequence plaintiff suffered the alleged injuries.

The defendants pleaded in short by consent the general issue with leave to give in evidence any matter which if well pleaded would be admissible in evidence with similar leave to the plaintiff to make like reply.

The jury returned a verdict against the defendant Louisville and Nashville Railroad Company in the sum of $50,000. There was a motion for a new trial which the court overruled and hence this appeal.

Testimony for the plaintiff tended to show that a pick-up truck of which the plaintiff was the driver was in collision with a passenger train of the railroad company on March 10, 1953. It was daylight and the weather was clear. The collision occurred within the city limits of Cullman, Alabama, at the point at which 8th Avenue, a paved street, which running slightly south and northwest, crosses the tracks of the railroad company, which run north and south diagonally at grade. There are five tracks in all designated, respectively, from east to west as follows: (1) the east hill track, (2) the north-bound main, (3) the passing track, (4) the south-bound main and (5) the storage track. 8th Avenue is about 40 feet wide where it crosses the tracks and is generally level over the entire crossing but rises slightly just east of the easternmost rail of the hill track. The width of each track from rail to rail is 4 feet 8 inches. The distance from the easternmost rail of the hill track to the corresponding rail of the next or north-bound main is 26 feet, 7 inches. The remaining tracks are spaced so that the west rail of each is approximately 10 feet from the east rail of the next. The total distance from the east rail of the "hill track" to the point of collision was approximately 54 feet. An Alabama Stop Sign was situated about 19 feet east of the east rail of the "hill track" on the southerly side of 8th Avenue. A white crossbuck sign was situated near the west rail of the "storage track" on the southerly side of 8th Avenue. There were no buildings or other natural obstructions to obscure the view from a point east of the rail of the hill track, northward along the railroad tracks, which were straight for more than 600 feet north of the crossing. Approximately 1,500 feet south of the 8th Avenue crossing was the Cullman Railroad Station at which a north-bound train was standing on the "north-bound main track." About 700 feet south of the crossing a switch engine was engaged in placing cars on the "hill track." A stationary cut or string of four or five cars was on the "passing track" north of the 8th Avenue crossing. According to the tendencies of the evidence, the southernmost of these standing cars was about 100 feet north of the crossing.

An unpaved street, called Main Street, was east of the tracks. This street ran northeasterly roughly parallel with the tracks north of the crossing to and beyond a Standard Oil Company plant and entered 8th Avenue from a northerly direction at a point about 12 or 15 feet east of the east rail of the "hill track." The plaintiff had been up Main Street to the Standard Oil Plant and had secured a drum of gasoline in his pick-up truck. He had then proceeded southwesterly along Main Street to or near the point at which the latter ran into 8th Avenue, where he stopped. The

truck was then facing generally in a south-westerly direction. The truck was next seen by plaintiff's witness Duke, who was at a warehouse just east of the railroad tracks and about a block and a half south of the crossing. It was then moving westerly across the series of tracks at about 10 or 15 miles per hour, according to Duke, and was on track 2, the northbound main track.

The train, consisting of a steam locomotive and five passenger cars, approached the crossing from the north on track 4, "the south-bound main track." Tendencies of the evidence show that its speed was 40 to 45 miles per hour. Duke saw the train some considerable distance north of the crossing but testified that it then disappeared from his view behind the standing cars on track 3, which he said extended to a point about 100 feet north of the crossing. Duke next saw the train when it cleared these cars and he testified that he did not hear any bell or whistle sounded until this time, when one whistle signal was heard by him. He heard the noise of the train before he heard the whistle. Plaintiff's truck continued westerly across the series of tracks until the left front side of the engine and the right front side of the truck made contact. The train was about 100 feet north of the crossing when Duke first saw plaintiff's truck. The truck was turned around once and after the collision was again headed west with one side of the truck on the edge of the crossing. It was not turned over. Plaintiff was lying unconscious on the street between tracks 2 and 3. The trains stopped about even with where the witness Duke was which he testified was a block or a block and a half south of the crossing. The crossing was open, level and readily visible.

The only other witness for the plaintiff who saw the truck in the vicinity prior to the collision was Isaac Rainey. He testified that as he left Reeves' store on 8th Avenue and drove north on Main Street, plaintiff's vehicle was on Main Street at the place at which it joined 8th Avenue, standing still with the rear end of it pointed northwardly toward the Standard Oil Plant. The wit-

ness passed by the truck and drove northwardly to his place of work about a block or a block and a half which he estimated took him about 3⅓ minutes and then saw the train come by his place of business, The Cullman Ready-Mixed Concrete Company. As the back end was passing, Rainey heard the sound of the air-brakes going on. Rainey testified that he did not hear a train whistle or bell, but he would not testify that the whistle did not blow. He said "it might have blown." He stated that the northernmost of the standing cars on track 3 was about even with the Ready-Mixed Warehouse. He had seen the switch engine which was on track 1 south of the crossing moving southwardly when he was in the neighborhood of the crossing.

The plaintiff, C. E. Tucker, testifying in his own behalf, stated that he did not remember the collision nor anything for a period of 15 to 30 minutes before the collision. He could not say whether or not the train blew nor whether or not he stopped.

A Cullman city ordinance fixed a speed limit of 20 miles per hour on trains crossing any public crossing in the city limits. The limits of the city had been extended prior to 1948 but no signs along the railroad tracks indicated the limits of the city.

There was testimony with reference to the injuries and condition of the plaintiff after the accident. We shall refer to this testimony later in the opinion.

Charlie Harris, a witness for the defendant who was the fireman on the engine which was in the collision, testified that he had had 31 years experience as a fireman and was at his post on the left side of the engine as it approached the crossing. The engine was equipped with a bell, operating on air, which he had turned on ¼ mile before reaching the whistle post north of the crossing and that it rang until he turned it off after the collision. He first saw the pick-up truck when it was east of the "Hill Track", No. 1, moving west at 10 to 12 miles per hour. At this time the train was about a block north of the crossing going at about 35 miles per hour. There were no

obstructions between him and the truck at this point. The crossing signal, 2 longs, a short and a long, were blown on the whistle north of the crossing and the whistle was still blowing when the engine got on the crossing. He watched the truck and it continued from east of track 1 across and on to and across track 2 and was coming on toward the passing track and the witness figured it would not stop so he hollered "That'll do!", whereupon the engineer applied the brakes in emergency with all the pressure he had. The next he knew there was a crash. Harris was keeping a lookout as the train approached the crossing. The engineer controls the whistle and the witness did not know how far east of the first track the truck was when he first saw it but it had not gone on the first track and was between the first track and the cross-buck sign on the north side of the road. No signal was given by the fireman when the truck was first seen but when it reached and got on track No. 2 without diminishing speed he didn't think it was going to stop and the fireman hollered "That'll do!" The engine was 18 or 20 car lengths north of the crossing when he first saw the truck. One car length is 40 feet. The engine was 10 or 15 car lengths from the crossing when he hollered, "That'll do!" He couldn't see the man in the truck when he said "That'll do," but just could see the truck.

James W. Jones, the engineer, testified that he was at his place of duty on the right side of the engine, that he never saw the truck prior to the collision, the front of the engine was 65 to 75 feet from 8th Avenue when the signal "That'll do" was given him. He gave it as his opinion that the emergency brakes had just gotten on when the engine reached 8th Avenue. He further testified that the train was travelling 35 to 40 miles an hour 300 feet from the crossing and that the train was going 35 to 38 miles per hour at the time of the collision.

I. It is argued that the corporate defendant was entitled to have the verdict set aside and a new trial granted upon its motion and that the court was in error in refusing to grant the motion. The case was submitted to the jury on both counts. The court charged that no verdict could be found against the corporate defendant under the wanton count (Count 2) without a verdict also being found against the engineer, J. W. Jones. This charge was not challenged. As taken by the jury it was possible for a verdict to be found against the corporate defendant under Count 1 for and on account of (1) simple negligence of the engineer, (2) subsequent negligence of the engineer, (3) simple negligence of the fireman and (4) subsequent negligence of the fireman.

The jury found against the corporate defendant but in favor of the engineer Jones. R. L. Turner Motors v. Hilkey, 260 Ala. 577, 72 So.2d 75. It follows that the verdict against the railroad must be rested solely upon some conduct of the fireman constituting simple, initial negligence or subsequent negligence one or the other or both, as the proximate cause of the collision of the train and the truck. As we read the briefs of counsel both sides agree to this situation. In fact the appellee insists that the testimony requires affirmance of the verdict and judgment of the lower court on the theory of conduct on the part of Charlie Harris, fireman, which constituted initial or subsequent negligence. As the train approached the 8th Avenue crossing the fireman was at his post on the left side of the engine keeping a lookout ahead and to the left of the track. He had no personal control either as to the throttle, brakes or whistle on the engine. It is uncontradicted that he was watching the crossing at 8th Avenue and that he observed plaintiff's pick-up truck which he watched from a point before it reached the first rail in its path until the moment of the collision. It thus appears that he was discharging his general duty prior to his discovery of the alleged peril of the plaintiff.

On cross examination Charlie Harris testified that he first saw the plaintiff's truck when the engine was 18 to 20 railroad car lengths north of 8th Avenue, a distance of 720 to 800 feet. A car length is 40 feet. He further testified that he gave the warn-

ing to the engineer "That'll do" when the engine was 10 to 15 car lengths from the crossing. Upon careful consideration we are satisfied that a jury question is presented on the issue of subsequent negligence.

Charlie Harris was a witness for the defendant. It is strongly argued that the foregoing estimates of distance are not capable of rational belief under the circumstances. As we understand the argument, it is claimed that this testimony of the witness must be disregarded because it is so at variance with the laws of physics as to be patently incorrect and impossible of rational belief. Of course if the testimony of Charlie Harris is so inherently or physically impossible as to be manifestly false and contrary to the laws of nature, the testimony should be disregarded as being without evidentiary value even though uncontradicted. King v. Brindley, 255 Ala. 425, 51 So.2d 870.

When analyzed appellant is in the position of seeking to have the court disregard what its own witness said as to distance because it does not mathematically check with what he said as to the speed of the two vehicles involved in the accident. We are asked to disregard the inference from the testimony of Charlie Harris that plaintiff was in a position of peril when the train was 18 to 20 car lengths north of 8th Avenue because according to the estimated speed of the truck and train a collision would have been a physical impossibility, since the truck would have passed the point of collision before the train reached that point. But courts have refused to accept the "physical facts rule" when based on speeds and variables. This type of argument is properly made to the jury but a court will not substitute for the fact finding of the jury some calculation made by correlating distance and speed. We do not think that when the witness stated the speeds involved he could not be mistaken, but when he stated the distances involved, he could be mistaken and so definitely mistaken that the verdict of the jury based on the evidence cannot stand. In Cyclopedia of Automobile Law and Practice by Blash-

field, Vol. 10, Part 1, § 6597, p. 550, it is said:

"But the court should not indulge in arbitrary deductions from physical law and fact except where they appear so clear and irrefutable that no room is left for the entertainment in reasonable minds of any other deduction, and where it is contended that the physical facts connected with an automobile accident require a verdict for one party or the other, a jury question is generally presented. The above stated 'physical facts rule' does not apply where there are possible variables, or where moving objects are involved."

In Lewis v. Shiffers, D.C.Mun.App., 67 A.2d 269, in refusing to allow the verdict to be set aside on physical facts disclosed by plaintiff's own testimony, the court said that speeds are only estimated and that the jury had photographs, diagrams as well as verbal testimony, and taken together presented a typical case for jury consideration.

In Crocker v. Johnston, 43 N.M. 469, 95 P.2d 214, 217, it is said: "The physical facts rule may not be invoked with respect to speed, position, etc., of movable objects if the facts relating to speed, position, etc., must be estimated by oral evidence."

In Zimmer v. Clark, 103 Pa.Super. 145, 156 A. 815, 816, in referring to the physical facts rule, the court said: "Such 'incontrovertible physical facts' are never established by oral evidence as to the position, speed, etc., of movable objects." See Adams v. Armour & Co., 142 Pa.Super. 280, 16 A.2d 142; Hostetler v. Kniseley, 322 Pa. 248, 185 A. 300; Schaeffer v. Reading Transit Co., 302 Pa. 220, 153 A. 323.

See also Mobile City Lines v. Alexander, 249 Ala. 107, 30 So.2d 4.

The verdict of the jury was evidently based upon the subsequent negligence of the fireman. Repeating to some extent, his testimony is that he first saw the truck when it was "right in there by the cross buck sign" before reaching the first track. At that time the train was going 35 miles per hour and the truck was going 10 to 12 miles

per hour. The truck continued on across the first track and the fireman did not give any signal. The truck was between the second and third track when he told the engineer "That'll do." The engine was 18 to 20 car lengths from the crossing when he first saw the truck and one car length is 40 feet. The engine was 10 to 15 car lengths away when the fireman said "That'll do." The fireman testified that he couldn't see the man in the truck when he said "That'll do" but just could see the truck.

According to the testimony of Jones, the engineer, the front of the engine was 65 to 75 feet from 8th Avenue when the signal "That'll do" was given to him. In his opinion the emergency brakes had just gotten on when the engine reached 8th Avenue. In his opinion the train was going 35 to 40 miles per hour 300 feet from the crossing and going 35 to 38 miles per hour at the time of the collision. There was no error by the court in refusing to grant the motion on the ground which we have discussed.

■ II. It is argued that the plaintiff was guilty of subsequent contributory negligence as a matter of law. We cannot agree with this contention. Without dispute the plaintiff stopped at a point on Main Street where the latter ran into 8th Avenue. Examination of the maps and diagrams shows that the point of stopping was practically at Track No. 1 and, therefore, the plaintiff was not guilty as a matter of law of contributory negligence within the principle laid down by such cases as Bason v. Alabama Great Southern R. Co., 179 Ala. 299, 60 So. 922. Ordinarily when crossing a series of tracks the duty to stop and look and listen is a continuing duty. Roberts v. Louisville & Nashville R. Co., 237 Ala. 267, 186 So. 457.

In the instant case the train which collided with plaintiff's truck was on Track No. 4 approaching from the north. It is insisted that even if there was subsequent negligence on the part of Charlie Harris, the fireman, there was subsequent contributory negligence as a matter of law on the part of the plaintiff in not stopping, looking and listening before crossing Track No. 4. We quote briefly from the testimony of Mr. Woodward, a member of the Cullman Police Force:

"Q. Now, I will ask you if a man after he had gotten * * * and that is what the picture is for * * * after he had gotten across this first track, he couldn't stop again without stopping on a track. Suppose he had already crossed the first track, if he were to stop again before he got to the second track, could he make that stop * * * excuse me, would there be room between the second and first track for him to stop without fowling one or the other, or being close to it? A. No, sir.

"Q. I want to point out on the picture, the first track coming up to the second track, the man coming the way this fellow was coming, if he crossed the first one and if he stopped here at this stop sign and crossed the first track and suppose he were to stop again before he came to the second track in that space there, I want to know, would either his back be across * * * be close to the track behind him or his front close to the track in front of him? A. Yes, sir.

"Q. And then after that if he were to stop again, he would be stopping on a railroad track? A. Yes, sir."

On redirect examination we quote the following:

"Q. And if he stopped where he was asking you, would he not be stopping where the front or back of his vehicle would foul one of the other tracks? A. Yes, sir, he wouldn't have enough space there.

"Q. He would be stopping on a track to keep from stopping on a track? A. Yes, sir."

The record shows that in addition to the train which struck the plaintiff's truck there was another north-bound train at the station on one of the tracks and a train switching north of the crossing on another of the tracks. It is obvious that if the plaintiff had stopped on any of the tracks

and had been injured by being struck by a train on the track upon which he had stopped, it could be seriously said that he was inviting his own injury by stopping on the track instead of keeping straight ahead once he started across the set of tracks.

We cannot say that as a matter of law plaintiff was guilty of subsequent contributory negligence because he did not stop on one of the tracks before he got to Track 4, where to do so would increase his danger or would increase his danger so far as he could tell. The court acted correctly in submitting all of this to the jury. Gulf, M. & O. R. Co. v. Sims, 260 Ala. 258, 69 So.2d 449; Louisville & N. R. Co. v. Young, 153 Ala. 232, 45 So. 238, 239, 16 L.R.A.,N.S., 301; Atlantic Coast Line R. Co. v. Flowers, 241 Ala. 446, 3 So.2d 21.

III. Assignments of error are based on plaintiff's closing argument to the jury. It is claimed that in the closing argument counsel undertook to supply deficiency of proof brought about by plaintiff's amnesia by stating to the jury what his client "might tell you." We are not entirely sure that counsel pointed out to the trial court the portion of the argument deemed objectionable. Pacific Mut. Life Ins. Co. v. Yeldell, 36 Ala.App. 652, 62 So.2d 805. Assuming, however, that the objection did specifically and sufficiently indicate or separate the objectionable remark, we do not consider that the remark constitutes reversible error. Considerable latitude is permitted counsel in arguing inferences from the evidence. City of Birmingham v. Bowen, 254 Ala. 41, 47 So.2d 174. Furthermore the right of counsel to pursue his own line of argument within legitimate bounds is a constitutional right and as much discretion is allowed the trial court as is necessary to a due and orderly procedure. Birmingham News Co. v. Payne, 230 Ala. 524, 162 So. 116. We will not too narrowly criticize arguments of counsel in the matter of inferences drawn for illustration or figures of speech adopted in pressing a point. Jones v. Colvard, 215 Ala. 216, 109 So. 877; Birmingham Electric Co. v. Cleveland, 216 Ala. 455, 113 So. 403. In the cases cited by appellant counsel re-ferred to an absent witness and gave the impression that if that witness were in court, he would give certain testimony. In the instant case the plaintiff actually took the stand and stated that he had retrograde amnesia and could not give testimony as to whether, among other things, he stopped or not. Obviously under these circumstances the effect of the argument could not be that Mr. Tucker under any circumstances could testify one way or the other.

IV. Error is predicated on the action of the court in overruling the motion to set aside the verdict and grant a new trial on the ground that the verdict is excessive. As stated, the verdict was for $50,000, based on compensatory damages. The plaintiff, C. E. Tucker, was 51 years of age at the time of the accident. He had a life expectancy at the time of the trial of 20.37 years. According to the testimony of Dr. Williford the plaintiff as a result of the accident suffers from an injury to his brain. After the plaintiff had been in the hospital in Cullman ten days under the care of Dr. Williford, Dr. Williford referred the patient to neuro-surgeons in Birmingham, Drs. Galbraith and Graham. Prior to the accident the plaintiff was an able-bodied farmer operating his farm of 87 acres in Cullman County, Alabama. According to Dr. Williford the plaintiff will not be able to go back to work as a farmer and he cannot expect any additional bodily improvement. According to Dr. Williford the plaintiff's brain is not functioning like a normal man's brain and in his opinion it never will so function. He gave it as his opinion that no improvement could be expected in the thinking processes of the plaintiff.

Dr. Stanley Graham, the neuro-surgeon and the partner of Dr. Garber Galbraith, testified that he first saw the plaintiff at the Jefferson Hospital after the plaintiff had been in the Cullman hospital. At the time he saw him the plaintiff was still in a semi-comatose state. He testified that he could be aroused and he would take a little nourishment. He didn't know where he was. He didn't realize what was going on about him. He had some weakness of the

left arm and left leg but there was no sign of pressure on the brain. A spinal tap was done and the pressure was normal. The fluid was slightly blood-tinged, indicating that he had a bruise of the brain.

Dr. Graham testified that after Mr. Tucker went home he was very dizzy when he walked and he had to use a cane and had to watch where he was going to keep from stumbling, that he had about reached all the improvement that could be expected. He further testified that while the plaintiff got around he reacted like a man fifteen or twenty years older than he actually was. His memory was poor and his mental re-actions were those of a man of a good many years more than his actual age—probably 10, 12 or 15 years older than he is right now. He further testified that the plaintiff's brain was bruised, that there is a small amount of blood diffusedly over the brain whereas in a stroke there is a large amount of blood in one particular location, that the effect is that "it works the result to that degree in the same way by putting blood there on the surface of the brain," that the presence of the blood and the blow, "the initial blow and the blood and the swelling will cause some of the cells of the brain actually to die."

Dr. Graham further testified as to the severe injury which resulted in the plain-tiff's loss of balance so that without fixing his eye on something before him, "they are partially lost in space because the little balance—mechanisms in the inner ear isn't telling them just exactly" and "if he didn't look he would stagger and bump into things."

Dr. Graham in testifying as to the mea-ger improvement of the plaintiff said: "He was disoriented, he didn't know where he was or who he was or when it was." That his memory is bad and that his ability to concentrate is bad and such things are those which you would naturally expect from an injury of this severity." He further testi-fied that if the plaintiff is attempting to carry on a conversation of any connected or continuous nature, he loses the thread of it and loses concentration and his head be-gins to hurt him and he gets nervous and agitated and these symptoms you would expect from a severe head injury. And further you would expect "a bad feeling of not being right" and that "there was enough blood in the spinal fluid to show that there was a hemorrhage in the brain as a part of the bruising process." He testified that there is a machine called the electro-encephalogram which does for the brain something like an electrocardiogram does for the heart. The readings of the electro-encephalogram show the following: "An abnormal EEG which means that consider-ing the fact that the tip of the temporal lobes is an area frequently contused in head injuries, and that such contusions are frequently bilateral, this EEG would point to the possibility of such lesions being pres-ent in this case. Serial EEG's at intervals of 3–6 months might be helpful in indicat-ing whether or not the possible contusion would give rise to an epileptogenic focus resulting in phychomotor seizures."

Dr. Graham further testified that in his opinion the plaintiff will never be able to do the type of work that he did before.

Miss Esther Goodwin, a school teacher who had boarded with Mr. and Mrs. C. E. Tucker for four years, testified that she knew Mr. Tucker both before and after the injury. According to her before the acci-dent he was in very good condition. He was a good hard working man and a farmer and he was a normal man before the acci-dent. She testified that after the accident he could not concentrate like he once could, that he cannot now think, that he will be talking in conversation and it seems like it just leaves him and then he will start off on something else and maybe he will be talking to some one and will just stop and start doing this (indicating) and look way off, that was not the way he carried on a conversation before the accident. She fur-ther testified that he cannot now walk at all without his cane or stick, that he now spends most of his time in his house where he just sits all the time, "all day dreaming or studying; I just don't know what you would call it." She further testified that he does not now attend to any of his work out on the farm, that his only activity around the house is just to bring in coal.

She further testified that when he "walks around the house he can't walk without his stick and seems kinder wobbly when he walks," that he never makes a step without his stick, that the condition which she has been describing has been true since April of last year up until the present time and that from her observation he has not seemed to improve, that he goes to church in a car and seems to know where he is going when he gets in the car but sometimes he meets and greets his old friends and sometimes he just sits there and he doesn't meet them like he did. She further testified that since the accident he is not easy to get along with as he was before he got hurt, that she never saw him when he looked one bit mad before he got hurt and after he got hurt he will get mad with anything. She further testified that she saw the back window of the truck after the accident and "the print of his head back there where it had hit and sunk in."

According to the testimony of Mrs. C. E. Tucker her husband was a farmer but had done other work, having worked for the county and for a neighboring concern in a grist mill, that before the accident he raised on the farm cotton, corn, maize, some sweet and Irish potatoes, garden vegetables and also raised chickens, hogs and cows, that he had raised most of the stuff that his family ate except for such things as sugar and coffee, that before the accident plaintiff would get up at 4 o'clock in the morning and work from sun to sun. She further testified that after the accident she first saw her husband unconscious and that for the ten days he was in the Cullman Hospital he was not normal but was out of his head and that he was in the hospital in Birmingham several days before he came to himself and could be told what had happened to him. She testified that since the accident she gives him little things to do to try to help him pass off the time, that she lets him bring in a little coal or kindling or something like that. She further testified as to his inability to do any substantial work by showing that they had a hog to kill and that his brother and one of the neighbors came to help and that they didn't have any way of pulling the hog down and she said to her husband, "You reckon you could drive the tractor up there?" He drove the tractor up to the barn and back down to the house about 100 yards and when he got off that tractor he couldn't stand up and he staggered the rest of the day, "just staggering like a drunk man." She further testified that at times he can talk pretty well and at times "it just leaves him and he will just stare at you." He can't express himself. He can't think. He can't remember anything hardly. He is just not like he was. He is easily upset. She further testified that prior to the accident he had an even disposition. Since the accident he spends most of the day at home "just sits in a rocking chair." She saw him when he was brought to the witness room for the trial and he was "crying."

The plaintiff himself testified in the case. He said "I don't remember being in the Cullman Hospital. They said I was but I don't remember anything about it." He testified that the reason he got upset and cried the day before and during the trial was that he was nervous and worried and that this had been his condition since his accident. That he used to feed the hogs and chickens but he doesn't do that now and that he has no hogs left, that the only work he can now do is to bring in kindling and a little coal. He testified: "I can walk if I am just looking right where I put my feet and if I don't, if I look off or around my head gets to swimming and I am liable to just pitch one way as the other, but I can walk by noticing where I am going." He testified that his head "is swimming now," that he never now feels good.

In summation we think that the testimony tends to show with reference to the plaintiff's injuries that he has sustained a brain injury which did three things:

1. Inflicted total physical disability.

2. Inflicted a mental disability, likewise total for earning purposes, and something less than total, but still a very substantial mental disability for all purposes.

3. It altered his personality, left him a trembling invalid, who never feels good a single day of his life, on the verge of tears

frequently, wringing his hands and only occasionally capable of carrying on a rational conversation.

This court has laid down the principle that a verdict will not be disturbed as excessive where the trial court has refused to disturb the amount unless so excessive as to indicate passion, prejudice, corruption or mistake. Montgomery City Lines, Inc., v. Davis, 261 Ala. 491, 74 So.2d 923. And we have held that the correctness of a jury's verdict is strengthened when the presiding judge refuses to grant a new trial. Simpson v. Birmingham Electric Co., 261 Ala. 599, 75 So.2d 111; Gulf, Mobile & Ohio R. Co. v. Sims, 260 Ala. 258, 69 So.2d 449. Furthermore this court has said that, "Where there was evidence which, if believed, authorized the verdict [this court] will not reverse a judgment refusing a new trial". Montgomery City Lines, Inc., v. Davis, supra [261 Ala. 491, 74 So.2d 926]; Union Central Life Ins. Co. v. Guffin, 232 Ala. 254, 167 So. 321; Ray v. Richardson, 250 Ala. 705, 36 So.2d 89; Kurn v. Counts, 247 Ala. 129, 22 So.2d 725.

Among our own cases we find where a verdict for $30,000 was sustained in 1920 in Illinois Central R. Co. v. Johnston, 205 Ala. 1, 87 So. 866, 872, and in Southern Railway Co. v. Pullen, 248 Ala. 665, 29 So.2d 228, a verdict for $40,000 returned in 1946 was not regarded as excessive.

Our cases consistently hold that the present value of a dollar as compared with its value in former years must be considered in determining whether the amount awarded by a jury is excessive. Birmingham Electric Co. v. Thompson, 251 Ala. 465, 37 So.2d 633; Birmingham Electric Co. v. Howard, 250 Ala. 421, 34 So.2d 830; Magic City Bottling Co. v. Tolbert, 34 Ala.App. 516, 41 So.2d 619.

Considering the elements of damage in the case and remembering that the authority vested in courts to disturb the verdict of a jury on the ground of excessive damages is one which should be exercised with great caution and discretion, we are constrained to hold that the ruling of the court refusing to set aside the verdict should be upheld. We are unable to say that the amount of the verdict is the result of passion, prejudice, partiality or corruption on the part of the jury. We do not feel authorized to set the verdict aside especially in the face of the refusal of the trial court to do so after he heard the evidence and saw the plaintiff before him. Central of Georgia Ry. Co. v. White, 175 Ala. 60, 56 So. 574; Authorities supra.

We have carefully examined other assignments of error but do not consider that these other assignments require further discussion.

It is our conclusion that the judgment of the lower court should be affirmed.

Affirmed.

LIVINGSTON, C. J., and LAWSON and MERRILL, JJ., concur.